IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2011-NMSC-028

Filing Date: June 17, 2011

Docket No. 32,126

STATE OF NEW MEXICO,

      Plaintiff-Petitioner,

v.

RONALD MYERS,

      Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Michael Eugene Vigil, District Judge

Gary K. King, Attorney General
Martha Anne Kelly, Assistant Attorney General
Santa Fe, NM

for Petitioner

Caren Ilene Friedman
Santa Fe, NM

Edwards Law Firm, P.A.
Marc Walker Edwards
Santa Fe, NM

for Respondent

## OPINION

BOSSON, Justice.

{1}     In this, our second review of Defendant's convictions under the Sexual Exploitation of Children Act, we once again affirm the result of the trial below, and we also hold that trial judges have neither the power nor the discretion to stay the application of the Sex Offender Registration and Notification Act (SORNA) pending the outcome of an appeal. In affirming

1

Defendant's convictions, we reverse a second opinion of the Court of Appeals. After our first opinion in this case issued, the Court of Appeals held on remand that retroactively applying our opinion to Defendant's conduct "violates due process because it constitutes an unforeseeable judicial enlargement of the [Sexual Exploitation of Children Act], which operates like an ex-post facto law." *State v. Myers* (*Myers III*), 2010-NMCA-007, ¶ 23, 147 N.M. 574, 226 P.3d 673, *cert. granted*, 2010-NMCERT-001, 147 N.M. 674, 227 P.3d 1056. For the reasons that follow, we conclude that the Court of Appeals misapprehended both our opinion and the law relative to retroactive application of judicial decisions. Accordingly, we reverse and remand to the district court for further proceedings enforcing Defendant's convictions.

## BACKGROUND

**{2}** Defendant was convicted of seven counts of the Sexual Exploitation of Children Act (the Act), NMSA 1978, §§ 30-6A-1 to -4 (1984, as amended through 2007), for covertly videotaping two female minors while they used the bathroom in a government office in 2004. *State v. Myers* (*Myers II*), 2009-NMSC-016, ¶¶ 1-4, 146 N.M. 128, 207 P.3d 1105. Defendant hid the video camera beneath a radiator and positioned it to capture the pubic area of the victims before and after they used the restroom. *State v. Myers* (*Myers I*), 2008-NMCA-047, ¶¶ 2, 16, 143 N.M. 710, 181 P.3d 702, *rev'd*, *Myers II*, 2009-NMSC-016. Defendant was convicted under that portion of the Act which prohibits the intentional "'manufactur[ing of] any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if one or more of the participants in that act is a child under eighteen years of age.'" *Myers I*, 2008-NMCA-047, ¶ 9 (quoting § 30-6A-3(D)).

**{3}** Defendant appealed the convictions claiming that the images did not depict a "prohibited sexual act" and were not "obscene." *Myers II*, 2009-NMSC-016, ¶¶ 24, 34. Upon motion by Defendant, the district court ordered a stay of Defendant's required registration under SORNA, NMSA 1978, §§ 29-11A-1 to -10 (1995, as amended through 2007), pending the outcome of Defendant's appeal. *Myers I*, 2008-NMCA-047, ¶ 20; *Myers III*, 2010-NMCA-007, ¶ 28.

**{4}** The Court of Appeals reversed Defendant's convictions, relying on the only case, *State v. Rendleman*, 2003-NMCA-150, 134 N.M. 744, 82 P.3d 554, *overruled in part by Myers II*, 2009-NMSC-016, that had previously applied the Act. *Myers I*, 2008-NMCA-047, ¶¶ 17-19. Of the five prohibited sexual acts defined in the Act, the one at issue was "a 'lewd and sexually explicit exhibition with a focus on the genitals or pubic area of any person for the purpose of sexual stimulation.'" *Id.* ¶ 11 (citing § 30-6A-2(A) and defining the "prohibited sexual act" at issue). The Court of Appeals concluded that the videotaped images did not depict a "prohibited sexual act" because the images were neither "lewd and sexually explicit" nor manufactured "for the purpose of sexual stimulation" within the meaning of the Act. *Id.* ¶¶ 17-19.

**{5}** The State petitioned for certiorari, and this Court reversed. *Myers II*,

2

2009-NMSC-016, ¶¶ 12, 47. In *Myers II*, we explained that the images did depict a "prohibited sexual act" under Section 30-6A-2(A)(5) (1) as "'lewd and sexually explicit,'" *Myers II*, 2009-NMSC-016, ¶ 30, (2) focused on "'the genitals or pubic area,'" *id.*, and (3) they were made "'for the purpose of sexual stimulation,'" *id.* ¶ 27. We also held that the images were obscene within the meaning of the Act. *Id.* ¶ 40.

{6}     We remanded Defendant's appeal for the Court of Appeals to consider two remaining issues raised by the parties in the initial appeal that the appellate court had not yet addressed: (1) "whether the Act is void for vagueness as applied to Defendant's conduct," and (2) "whether the trial court properly entered a stay of execution that relieved Defendant of the obligation to register as a sex offender [under SORNA] pending the outcome of this appeal." *Myers II*, 2009-NMSC-016, ¶ 47. Instead of addressing the constitutionality of applying the Act to Defendant's conduct—one of only two remaining issues—the Court of Appeals reframed that issue, asked for additional briefing from the parties on that reframed issue, and proceeded down a different course. *See Myers III*, 2010-NMCA-007, ¶¶ 11-25.

{7}     The Court of Appeals held that our *Myers II* Opinion interpreting the Act had itself made the Act unconstitutionally vague as applied to Defendant. *Id.* ¶¶ 22-25. Through the eyes of the Court of Appeals, *Myers II* was an "unforeseeable judicial enlargement of the statute, which operates like an ex post facto law," such that Defendant could not fairly have foreseen that his conduct would be "lewd" within the reach of the Act. *Myers III*, 2010-NMCA-007, ¶¶ 22-23. Notably, the Court of Appeals on remand adopted a position not endorsed by either party to the appeal and certainly not one requested by this Court's mandate. *See id.* Instead, the parties in their supplemental briefing to the Court of Appeals agreed that *Myers II* did *not* create a vagueness issue. Defendant responded that *Myers II* had no impact on his earlier void for vagueness claim.[1] The State argued that *Myers II* had "foreclose[d] any claim of vagueness." Subsequently, during oral argument before this Court, Defendant admitted he had previously argued that *Myers II* had no effect on his original void for vagueness claim, although he asks us now to uphold the ultimate conclusion in *Myers III*.

{8}     The Court of Appeals did address the second of the two issues remaining on remand—whether the district court could lawfully issue a stay of the SORNA registration requirements pending appeal—which the Court of Appeals answered in the affirmative. *Myers III*, 2010-NMCA-007, ¶¶ 26-33. The State then petitioned for certiorari as to both rulings, asking us to reverse the Court of Appeals by upholding Defendant's convictions and clarifying that SORNA sexual offender registration cannot be stayed pending appeal. We do so in this Opinion.

---

[1] Defendant argued in his original, *Myers I,* brief to the Court of Appeals that the *district court* had erred in "performing its gatekeeping function, and its concomitant error in failing to dismiss the [i]ndictment . . . constitut[ed] . . . an unforeseeable and retroactive expansion of the Act's narrow and precise language."

3

ANALYSIS

**{9}** As explained, we review Defendant's convictions for a second time. Initially, we address the Court of Appeals conclusion that our *Myers II* Opinion made the Act unconstitutionally vague as applied to Defendant's conduct. We also perform the constitutional analysis of the Act's statutory language that we requested on remand. Finally, we consider whether any district judge has the authority to stay the SORNA requirements pending appeal. We review such "issues of statutory and constitutional interpretation de novo." *State v. Lucero*, 2007-NMSC-041, ¶ 8, 142 N.M. 102, 163 P.3d 489.

**The Court of Appeals Analysis of Myers II**

**{10}** Concluding that our *Myers II* opinion was "unforeseeable," the Court of Appeals held that we had rendered the Act unconstitutional as applied to Defendant. *See Myers III*, 2010-NMCA-007, ¶ 18. The Court did so primarily by relying on a U.S. Supreme Court opinion, *Bouie v. City of Columbia*, 378 U.S. 347 (1964), which we will address momentarily. *See Myers III*, 2010-NMCA-007, ¶ 15. To support its analysis, the Court of Appeals also cited two New Mexico cases, *State v. Alderette*, 111 N.M. 297, 804 P.2d 1116 (Ct. App. 1990), and *State v. Johnson*, 2001-NMSC-001, 130 N.M. 6, 15 P.3d 1233, that previously had discussed or applied *Bouie*. *See Myers III*, 2010-NMCA-007, ¶¶ 16-18.

**{11}** In *Alderette*, our Court of Appeals correctly concluded, citing *Bouie*, that its construction of a criminal statute (escape from jail) to include a new class of inmates (those *civilly* committed to jail) could not be applied retroactively to the defendant (who escaped while civilly incarcerated for failure to pay child support) when the Court of Appeals had previously held the opposite: that the escape statute only applied to those in custody under *criminal* charges. *Alderette*, 111 N.M. at 298-300, 804 P.2d at 1117-19. The new and completely contrary construction of the escape statute could not be applied to the defendant's escape without raising due process concerns. *Id.* at 300, 804 P.2d at 1119.

**{12}** In *Johnson*, this Court in a footnote recognized *Bouie* as an extreme example of a "[c]ourt engag[ing] in an *impermissible interpretation* of a statute," that was "so *unexpected, [and] so outlandish, that no reasonable person could have expected it*," thus one that creates a due process problem when applied to an unsuspecting accused. *Johnson*, 2001-NMSC-001, ¶ 14 n.4 (alteration in original) (emphasis added) (internal quotation marks and citation omitted). Correctly, *Johnson* concluded that the first-time construction of DWI laws in that case, so as to reach intoxication on private property as well as public property, was altogether "foreseeable" in light of statutory language and the intended purpose of the statute. *Id.* ¶¶ 13-21. Significantly, and unlike the situation in *Alderete,* our courts had never held the opposite in previous opinions: that DWI laws did not apply to private property. *Johnson*, 2001-NMSC-001, ¶ 9.

**{13}** Accordingly, the principle we glean from these two prior opinions is that it is fundamentally unfair to apply a criminal statute to the accused in a way that contradicts

4

binding precedent on the same question, upon which the accused could have relied. Before examining our own opinion in *Myers II* in that same light, we turn to *Bouie*, 378 U.S. 347.

**{14}** *Bouie* arose when, in 1960, two African-American college students, protesting South Carolina's oppressive Jim Crow segregation practices, entered a whites-only restaurant and awaited service. *Id.* at 348-49. Upon being denied and told to leave, the two students refused to leave, whereupon they were arrested and prosecuted for criminal trespass. *Id.* The U.S. Supreme Court overturned the trespass convictions on due process grounds, because the convictions were based on a novel interpretation of that trespass statute that flatly contradicted clear precedent in the students' favor and effectively amounted to an ex-post facto law. *Id.* at 362-63.

**{15}** Importantly, the South Carolina Supreme Court had previously applied the criminal trespass statute many times over the years, *uniformly* requiring notice to the trespassing party *before* entry, something that was conspicuously absent in the present case. *See City of Columbia v. Bouie*, 124 S.E.2d 332 (S.C. 1962), *rev'd*, 378 U.S. 347. The U.S. Supreme Court noted that

> in the 95 years between the enactment of the statute in 1866 and the 1961 decision in the [first case to support a conviction for remaining on the premises upon receiving notice after entry], the South Carolina cases construing the statute *uniformly emphasized the notice-before-entry requirement*, and gave not the slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave.

*Bouie*, 378 U.S. at 356-57 (emphasis added) (referencing prior cases such as *State v. Mays*, 24 S.C. 190 (1886); *State v. Green*, 14 S.E. 619 (S.C. 1892); *State v. Tenny*, 36 S.E. 555 (S.C. 1900); *State v. Olasov*, 130 S.E. 514 (S.C. 1925); *City of Charleston v. Mitchell*, 123 S.E.2d 512 (S.C. 1961), *rev'd*, 378 U.S. 551 (1964)); *see also id.* at 350 n.2.

**{16}** South Carolina's novel statutory interpretation resulted despite the "admirably narrow and precise" language of the statute, specifically stating the temporal relationship between elements of the crime—first warning, then illegal entry. *Bouie*, 378 U.S. at 351-52. The U.S. Supreme Court reasoned that, unlike a broad or vague statute,

> [w]hen a statute on its face is narrow and precise . . . it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction.

*Id.* at 352. If an "*unexpected and indefensible*" construction of a statute is given retroactive effect, *id.* at 354 (emphasis added) (internal quotation marks and citation omitted), a criminal defendant is deprived of due process of law "in the sense of [not receiving a] fair warning

5

that his contemplated conduct constitutes a crime," *id.* at 355.

**{17}** How do these important due process principles of *Bouie* apply to our opinion in *Myers II*? We are at a loss to say. Unlike Defendant in the present case, the students in *Bouie* fell clearly outside the scope of the criminal trespass statute according to its own "narrow and precise" language, as confirmed by nearly a century of case law. *Bouie*, 378 U.S. at 351. The students in *Bouie* were undisputedly on the property of another *before* they were warned, while the statute specifically prohibited entry occurring *after* a warning to not enter. *Id.* at 350. By contrast, the dispute in the present case centers on the meaning of the word "lewd," *a term from an Act that this Court had never applied or interpreted,* much less interpreted in a fashion that would have comforted Defendant and lulled him into a sense of security, as was the case for the students in *Bouie*. *See Myers III*, 2010-NMCA-007, ¶ 22.

**{18}** Unlike the simple task of determining whether a warning occurred *before* entry or *after* entry, *lewdness* is considered on a case-by-case basis, given an evaluation of many factors; it is not "narrow and precise" in its meaning. *See United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Calif. 1986), *aff'd*, *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987); *Rendleman*, 2003-NMCA-150, ¶ 43 ("[M]ost courts have adopted the '*Dost* factors' to help determine whether a photograph involving a child is lewd."); *see also Myers II*, 2009-NMSC-016, ¶ 20 (applying the same factors, but emphasizing that "'these factors are neither comprehensive nor necessarily applicable in every situation, . . . there may be other factors that are equally if not more important in determining whether a photograph contains a [lewd] exhibition," and '[t]he inquiry will always be case-specific'" (alteration in original) (quoting *United States v. Amirault*, 173 F.3d 28, 32 (1st Cir. 1999))); *Myers I*, 2008-NMCA-047, ¶ 12 (applying the same factors).

**{19}** Notably, our Court of Appeals in *Rendleman* acknowledged that it could be "difficult . . . to articulate" the meaning of certain elements of the Act. 2003-NMCA-150, ¶ 46. The Court quoted and applied a case describing certain of the *Dost* factors as "confusing and contentious." *Id.* We find *Rendleman*'s assessment persuasive. Divining the meaning of certain elements of the Act and applying the elements to differing fact situations will challenge our courts for years to come.

**{20}** In short, a determination of "lewdness" is vastly different from an evaluation of whether conduct falls into a category described by "narrow and precise" language, as was the situation in *Bouie*. Equally important, this Court had never previously applied "lewd" in a manner opposite to our application in *Myers II*, such that Defendant might have believed his conduct was *not* lewd. Any parallel between the persecuted students in *Bouie* and the actions of Defendant in this case is simply unpersuasive.[2]

---

[2]The Court of Appeals also relies on a quote from 1 Wayne R. LaFave, *Substantive Criminal Law* § 2:14(c) (2d. ed. 2003), discussing the risks of retroactive application of judicial decisions, *Myers II*, 2009-NMSC-016, ¶ 24, but LaFave then proceeds to qualify

**{21}** Despite these obvious differences, our Court of Appeals asserted "only one reason why *Myers II* is an unforeseeable interpretation" of the Act: namely, that our *Myers II* opinion was based upon the "'voyeuristic quality'" of the offensive images at a time when voyeurism was not a crime in New Mexico. *Myers III*, 2010-NMCA-007, ¶ 20 (quoting *Myers II*, 2009-NMSC-016, ¶ 24). According to the Court of Appeals, "the *Myers II* test for determining what is 'lewd' under the child pornography statute" was unforeseeable because we adopted reasoning used in a 2006 Illinois case, *People v. Sven*, 848 N.E.2d 228 (Ill. App. Ct. 2006), and because New Mexico's own voyeurism statute was not enacted until 2007, long after Defendant created the offensive images in this case. *Myers III*, 2010-NMCA-007, ¶¶ 21-22. In addition, the Court of Appeals mentions that in *Myers II* we overruled a small part of the Court of Appeals opinion in *Rendleman*. *See Myers III*, 2010-NMCA-007, ¶ 23. In light of all this, the Court of Appeals concluded that we had effectively rewritten the Act, crafting "an unforeseeable judicial enlargement of the statute, which operates like an ex post facto law." *Id.* Thus, according to the Court of Appeals, it was "unreasonable to expect a person of ordinary intelligence [Defendant] to be on notice of what conduct was within the scope of [the Act]," and therefore "applying the new Myers II interpretation . . . to Defendant's conduct . . . offends due process." *Id.* ¶ 24.

**{22}** We take these points one at a time. Obviously, we did not hold that Defendant was guilty of the non-existent crime of voyeurism. Similarly, the *Sven* reasoning that we found persuasive in *Myers II* was not hinged upon ideas that had only developed since Defendant's exploitive conduct. Thus, the dates of the enactment of the New Mexico voyeurism statute and the writing of the *Sven* opinion, relative to our *Myers II* opinion, have no bearing on the constitutionality of the Act as applied to Defendant's conduct.

**{23}** Voyeurism is and has been an activity defined by observing naked bodies from a covert perspective for sexual gratification. Images that convey a voyeuristic perspective therefore, by definition, fulfill several of the *Dost* factors that our courts use to ascertain

---

those risks significantly:

> Actually, the proposition cannot be applied that broadly, as all case-law, including that interpreting criminal statutes, operates retroactively, and such retroactivity is an essential part of our legal system. It is fair to conclude that: (1) the prohibition of retroactive judicial decisions is not as extensive as the prohibition of ex-post facto statutes; and (2) the law regarding the former is not as clearly developed as that concerning the ex-post facto clause.

LaFave also notes that "'the promise of *Bouie* has been largely illusory,' as 'courts have construed the foreseeability requirement generously,'" and are inclined to "reverse on *Bouie* grounds only when the judicial change seems entirely arbitrary." *Id.* (quoting Harold J. Krent, *Should Bouie Be Buoyed?: Judicial Retroactive Lawmaking and the Ex Post Facto Clause*, 3 Roger Williams U. L. Rev. 35, 39 (1997)).

when an image can fairly be described as "lewd" within the meaning of the Act. *Compare The American Heritage Dictionary* 1930 (4th ed. 2000) (A voyeur is "a person who derives sexual gratification from observing the naked bodies or sexual acts of others, especially from a secret vantage point."), *with Myers I*, 2008-NMCA-047, ¶ 12, *and Myers II*, 2009-NMSC-016, ¶ 9 (citing *Dost*, 636 F. Supp. at 832, which offers factors for determining if an image is lewd, including a focus on the pubic area, a sexually suggestive setting, unnatural poses, partial clothing, and designed "to elicit a sexual response in the viewer"). In addition, "lewd" is commonly defined as either "[p]reoccupied with sex and sexual desire; lustful" or "[o]bscene; indecent." *The American Heritage Dictionary*, *supra*, at 1007. Compare that definition with our description of the images in *Myers II*, 2009-NMSC-016, ¶ 24: "[T]he private nature of the setting, the intimate bodily function in which the victims are engaged, and the voyeuristic quality of the images all combine to transform th[e] otherwise prosaic setting into a fetishistic and sexualized one."

**{24}** Thus, it was hardly novel, much less unforeseeable, that we would arrive at our conclusion in *Myers II* that "lewdness" could be assessed through the prism of an image's voyeuristic character. As an idea, voyeurism has been around for a long time; this Court did little more than recognize its defining characteristics. It is true that, before Defendant took his offensive images, this Court had never had the *opportunity* to address whether images conveying a voyeuristic perspective were lewd. But the mere absence of judicial authority on a point of law is hardly the test for a *Bouie*-type, "unexpected and indefensible" interpretation of a criminal statute. More to the point, neither this Court nor the Court of Appeals had ever *rejected* the characteristics of voyeurism as a possible aspect of lewdness; the subject simply never came up in *Rendleman*. As this Court had never created precedent upon which Defendant could rely, and the language of the Act clearly circumscribes certain images due to qualities that are shared with voyeuristic images, Defendant has no legitimate complaint against applying our ruling in *Myers II* to his conduct.

**{25}** Similarly, applying our few modifications of *Rendleman* in the *Myers II* opinion to Defendant does not provide any claim of unfairness or unforeseeability. *Rendleman*—an exemplary opinion in many ways and the seminal opinion in this area of the law—is nonetheless not an opinion of this Court, and before *Myers II*, this Court had *never* interpreted the Act one way or the other. Our denial of certiorari in *Rendleman* did not indicate any affirmation or adoption of law. *See* Rule 12-405 NMRA (specifying that only formal *opinions* involve "new points of law, making the decision of value as a precedent"); *State v. Breit*, 1996-NMSC-067, ¶ 13, 122 N.M. 655, 930 P.2d 792 ("[A] denial of [certiorari] review carries no implication that the decision or the opinion of the Court of Appeals was correct."); *see also Hagan v. Caspari*, 50 F.3d 542, 547 (8th Cir. 1995) ("We have some doubt whether a state supreme court's overruling of an intermediate appellate court decision ever can constitute a change in state law for due process purposes. In fact, we are strongly inclined to agree with the state that until the state's highest court has spoken on a particular point of state law, the law of the state necessarily must be regarded as unsettled."). Additionally, obvious differences between the facts of *Rendleman* and those in the present case make Defendant's reliance on the former perilous to say the least.

8

{26} *Rendleman* placed photographs into two categories: those that a reasonable jury could find portrayed a "prohibited sexual act" under the Act, and those that a jury could not. 2003-NMCA-150, ¶¶ 29-31 ("[T]he district court may dismiss the charges where, on the undisputed face of the materials before the court, a jury could not find beyond a reasonable doubt that the material meets the elements of the offense as defined by the Act."). The Court of Appeals did not consider whether images focusing on underage females' pubic areas from a secret vantage point were lewd. Rather, the reasons certain images were not lewd in *Rendleman* included: (1) some of the images lacked both nudity and "'simulated' sexual behavior," *id.* ¶ 70; (2) some of the images did not clearly exhibit the minors' genitals or pubic areas, *id.* ¶¶ 71, 80; and (3) the obvious purpose or theme of some images was not sexual, but rather, were artistic, familial, documentary, or examples of "adolescent spontaneity," *id.* ¶¶ 73, 81-82.

{27} Defendant's images, in contrast, focused relentlessly on exposed pubic areas of minor girls; Defendant made no argument of any innocent or artistic theme. To the contrary, Defendant conceded that the images were made for his own sexual gratification, something conspicuously absent from *Rendleman*, and he stored them among similar commercial materials, *Myers II*, 2009-NMSC-016, ¶¶ 3, 33. Further, we found that the covert angle**,** and other elements of the setting**,** contributed to making the theme voyeuristic and therefore sexual. *Id.* ¶ 23 ("This feeling of voyeurism is enhanced by the quality of the images, which are slightly unfocused and grainy, the perspective of the images, the victims are viewed from the floor adjacent to the toilet, and the shadows that border the images, which lend the sense that the viewer is peering at the female victims through a peep hole on the floor.").

{28} The portions of *Rendleman* that might apply to Defendant suggest that his images *were* lewd. In *Rendleman*, an "unusual focus on the girls' genitalia" weighed in favor of sending the photographs to the jury. 2003-NMCA-150, ¶¶ 72-73. Photographs that focused on the minors' genitalia without any discernable reason—their "purpose and predominant theme" were not obvious—could foreseeably be found lewd by a jury. *Id.* ¶¶ 77, 82 ("Given the questionable focus of these photos, a rational juror might find they were designed to appeal to prurient interests or that they are patently offensive and that the other photos were merely a pretext or cover for obscene material."). *Rendleman*, if anything, should have forecast our categorization of Defendant's images as *lewd*, rather than *not lewd*.

**Clarifying *Rendleman* and *Myers II***

{29} We acknowledge that our opinion in *Myers II* did alter *Rendleman* in two respects.[3]

---

[3]The Court of Appeals describes our minor differences with *Rendleman* as changing the elements of the crime, *Myers II*, 2009-NMSC-016, ¶ 1 ("On certiorari, the Supreme Court overruled and modified *Rendleman* in part, with the result that the elements of the crime were changed . . ."), a conclusion we find unsupportable. The elements of the crime remain as they were inscribed in the statute. All that has changed is that this Court has had

9

First, the Court of Appeals had limited the scope of "lewd and sexually explicit exhibition" to *"hard-core child pornography; that is, it must display visible signs of sexual eroticism, rather than merely depict a naked child."* *Rendleman*, 2003-NMCA-150, ¶ 44 ("An 'exhibition' requires an objective showing, apart from the child's genitalia being merely visible. Webster's defines 'exhibition' as 'showing, evincing, or showing off.' To 'exhibit' is to 'show or display . . . outwardly esp[ecially] by visible signs or actions; . . . to have as a readily discernible quality or feature; [or] . . . to represent or make clear by a drawing, plan or other visual means.' The word 'explicit' is 'characterized by full clear expression; being without vagueness or ambiguity: leaving nothing implied: unequivocal.' In the context of the Act then, a 'lewd and sexually explicit exhibition' means a visible display or readily discernible depiction of a child engaged in sexually provocative conduct. In other words, the photograph must be identifiable as hard-core child pornography . . . ." (alterations in original) (internal citations omitted)). This Court, however, found that a sexually explicit exhibition "is a clear, graphic and unequivocal display or portrayal of nudity or sexual activity" and concluded that this display or portrayal, even combined with lewdness, need not be synonymous with "hard-core pornography." *Myers II*, 2009-NMSC-016, ¶¶ 19, 26.

{30} We clarified that, in the context of adult pornography, the idea of "hard-core pornography" assists in describing images that are *obscene* (and thus unprotected by the First Amendment, as recognized in federal jurisprudence), but when the objects of the pornography are *children*, no such hard-core pornography consideration should be read into the Act. *Myers II*, 2009-NMSC-016, ¶ 26 (citing *Miller v. California*, 413 U.S. 15, 27 (1973), and contrasting the application of the term "hard-core" in obscenity jurisprudence with its use to determine "lewd and sexually explicit" in *Rendleman*, 2003-NMCA-150, ¶ 44). Though we differed with the Court of Appeals on this point, we noted approvingly certain language from the *Rendleman* opinion that described the obscenity standard: "'What the community finds tolerable for adults will be a far cry from what it will tolerate when visual materials include children.'" *Myers II*, 2009-NMSC-016, ¶ 38 (quoting *Rendleman*, 2003-NMCA-150, ¶ 61). Our disagreement with *Rendleman* on this point—merely a small part of a larger discussion of lewdness, most of which we agreed with in *Myers II*—falls far short of the "unexpected" and "indefensible" standard that would give rise to due process concerns. We note that although *Myers III* initially equates our eliminating "hard-core child pornography" with changing an element of the crime, the opinion never returns to that point or explains why a "hard-core child pornography" analysis would have any impact on the application of the Act to Defendant's conduct or help Defendant in any way. Accordingly, we shall not pursue it either.

{31} Second, we altered the *Rendleman* analysis in terms of the third element in the Section 30-6A-2(A)(5) definition of a "sexually prohibited act": whether images are made "for the purpose of sexual stimulation." *Rendleman* had concluded that images must pass

the opportunity—for the first time—to address those elements in this precise context, a factual setting which differs significantly from *Rendleman* in certain respects.

10

an objective test; they must objectively appear to be intended to sexually stimulate others. *See* 2003-NMCA-150, ¶ 48. The images cannot just stimulate the perverse, private mind of the maker. *Id*. In *Myers II*, we concluded that, usually, images must do both: (1) they must objectively appear created for the purpose of sexually stimulating, to satisfy the sixth *Dost* factor ("designed to elicit a sexual response in the viewer"), customarily used to define lewdness; and (2) the accused must also have the subjective intent to make the images for the purpose of sexual stimulation (either his own stimulation or someone else's). *Myers II*, 2009-NMSC-016, ¶¶ 20, 21, 32. Although this construction might appear to conflict with *Rendleman*, on closer examination the two opinions are more in harmony than not.

{32}    *Rendleman* was concerned that the maker's own perspective should not *alone* render otherwise innocent images pornographic. *See* 2003-NMCA-150, ¶ 48. And so, *Rendleman* made clear that subjective intent alone would not suffice. *See id.* "The premise behind an objective intent analysis is that child pornography is not created and the Act is not violated simply because a person derives sexual enjoyment from otherwise innocent photographs." *Id.* We find no fault with either *Rendleman*'s concern or its conclusion: subjective intent *alone* will not violate the Act. As we pointed out in *Myers II*, before we get to the question of the maker's intent, the prosecutor must first establish that the images are *lewd,* a question that considers the images objectively. 2009-NMSC-016, ¶¶ 20-21. The images cannot be innocent if they meet the threshold element of lewdness.

{33}    Thereafter, we look to the maker's intent to see what he or she had in mind in manufacturing images that already meet the objective criteria of "lewd." In *Rendleman*, however, the Court of Appeals chose to look to "the purpose of sexual stimulation," yet again from an objective perspective, in effect creating a redundancy which we corrected in *Myers II. Compare Rendleman*, 2003-NMCA-150, ¶¶ 43, 46-48 (concluding that "the Act is not violated simply because . . . a defendant's private reaction . . . transforms an innocent photo into a lewd exhibition, but rather [because of] the objectively ascertainable intended effect on the viewer" when it determined how to apply the third prong of "sexually prohibited act," requiring that an image be "for the purpose of sexual stimulation"), *with Myers II*, 2009-NMSC-016, ¶ 21 (clarifying that lewdness "focuses on whether the visual depiction was intended or designed to elicit a sexual response in the viewer, whereas the statute focuses on whether the visual depiction was intended or designed to elicit a sexual response in the defendant" and that the two inquiries are "separate and distinct"). But far from being an unfair surprise to Defendant in this case, our change in *Myers II* actually worked to his benefit.

{34}    Whereas previously in *Rendleman*, the prosecution only had to meet an objective standard, now, after *Myers II*, the state must apply both: an objective standard for lewdness and a subjective standard for the statutory element of "for the purpose of sexual stimulation." In line with the Court of Appeals' caution in *Rendleman*, no accused can be convicted under the Act merely for his own misguided subjective intent; the images must first satisfy the objective criteria for lewdness, such as the *Dost* factors. Whereas, before *Myers II* the state had only one purpose or intent hurdle, now it has two—hardly a due process imposition on

11

Defendant in this case.

**{35}** Even *Rendleman* appears to recognize the need for a subjective intent analysis of the accused—a fact we appreciate, perhaps belatedly. It seems that *Rendleman* always considered the subjective intent of the accused as a factor in its analysis. *Rendleman* directed that "[a]t trial, *the subjective motive of the photographer, the circumstances of the photography, and the use of the photo become relevant on the issue of intent.*" 2003-NMCA-150, ¶ 49 (emphasis added). These considerations are exactly the type we addressed in *Myers II* when we applied a *subjective* test to determine the fulfillment of the third statutory element of the Section 30-6A-2(A)(5) definition of "sexually prohibited act": whether the images were made for "the purpose of sexual stimulation." 2009-NMSC-016, ¶ 21.

**{36}** For the all the reasons previously discussed, we find no due process violation by virtue of applying *Myers II* to Defendant.

**Defendant's Unaddressed Due Process Arguments**

**{37}** In his original briefing to the Court of Appeals, before that Court issued *Myers I*, Defendant made three arguments that the Act was unconstitutionally vague as applied: (1) a person of ordinary intelligence would not have had notice that his conduct—characterized as simply "voyeurism"—was prohibited, (2) the Act was arbitrarily enforced, and (3) district court unconstitutionally expanded the meaning of the "narrow and precise statutory language" when it applied the Act to Defendant. These are the arguments that we expected would be addressed in *Myers III* when we remanded this case to the Court of Appeals. We address them now and find none meritorious.

**{38}** First, while Defendant argued he was not on notice that "voyeurism," characterized by "watching girls use the restroom" and "even surreptitiously videotaping them for his own use," would be criminal behavior under the Act, it was not Defendant's *voyeurism* that caused his criminal liability. Simply watching the girls without recording videos (and thus without manufacturing) would not have been criminal under the Act. Similarly, if Defendant had recorded *non-lewd* images of girls using the restroom, for his own or even others' sexual stimulation, he would not have incurred criminal liability under the Act. It was the combination of the specifically captured content of the images—their focus on the minors' genitals, the upward angle, the peephole-like framing, the grainy quality, and the objectively ascertainable purpose, making them *lewd* as discussed at length earlier in this Opinion and in *Myers II*—and Defendant's subjective sexual purpose for the images that made their covert manufacture by Defendant into a criminal act.

**{39}** Next, while it is true that the State arrested Defendant for his videotapes of minors, but not for those videos he took of adult women, that distinction cannot be described as "arbitrary enforcement." Rather than "'impermissibly delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the

attendant dangers of arbitrary and discriminatory application,'" *Old Abe Co. v. N. M. Mining Comm'n*, 121 N.M. 83, 91-92, 908 P.2d 776, 784-85 (Ct. App. 1995) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)), the Act specifically applies *only to minors*. Thus, Defendant's arrest and conviction for the images he manufactured of minors, but not those he manufactured of adults, was not arbitrary.

**{40}**     Finally, the district court did not unforeseeably expand the scope of the Act's "narrow and precise statutory language." Because we ultimately upheld the district court's holding in *Myers II*, and because *Myers II* did not unforeseeably expand the scope of the Act, this argument is also without merit.

**Judicial Stay of SORNA**

**{41}**     The Court of Appeals concluded that district judges have the authority to stay SORNA registration pending appeal of a conviction. *Myers III*, 2010-NMCA-007, ¶¶ 31-33. The Court characterized a stay of SORNA registration as part of Defendant's conditions of release pending appeal. *Id.* ¶ 31 (citing Rule 12-205(B) NMRA). "[B]ecause SORNA does not explicitly deprive a trial court of its discretion to stay the registration requirement pending appeal, and [New Mexico] rules and statutes otherwise vest such discretion in the trial court," *id.* ¶ 29, *Myers III* held that the district judge retains discretion to grant a stay, *id.* ¶¶ 31-33 (citing NMSA 1978, § 31-11-1(C) (1988) and quoting Rule 5-402(C) NMRA). We are not persuaded.

**{42}**     A district judge does not have discretion to stay SORNA registration. SORNA registration is not a sentence, nor is it a condition of release. Rather, "registration and notification provisions under SORNA are immediate and automatic, [but] they do not constitute punishment for a crime." *State v. Moore*, 2004-NMCA-035, ¶ 24, 135 N.M. 210, 86 P.3d 635. Unlike sentencing and release conditions, "SORNA is primarily remedial in purpose and effect." *Id.*; *see also* § 29-11A-2(B) (stating that the purpose of SORNA is "to assist law enforcement agencies' efforts to protect their communities"); *State v. Brothers*, 2002-NMCA-110, ¶ 20, 133 N.M. 36, 59 P.3d 1268 ("SORNA has a remedial purpose, namely, to protect communities from sex offenders.").

**{43}**     In *Moore*, the Court of Appeals was "persuaded by the rationale of the majority of jurisdictions, which hold sex offender registration law consequences to be collateral consequences of a plea." 2004-NMCA-035, ¶ 24. Thus, SORNA is a collateral consequence of the plea, which most certainly is not under the discretionary control of the court. *See id.* In fact, the Court of Appeals has recognized for years now, and we agree, that the district court does not "impose SORNA provisions or have discretion to modify them in accepting a plea." *Id.* ¶ 24.

**{44}**     While SORNA mandates a sex offender to register, the court plays no role in imposing that mandate. *See* § 29-11A-4(B); *see also Brothers*, 2002-NMCA-110, ¶ 22 ("The duty to register [as a sexual offender under SORNA] arises by legislative mandate, not

13

by court order.  SORNA requires the court to give notice, not to order a defendant to comply with SORNA.  The duty to register is an independent statutory duty with a remedial purpose and is not terminated by dismissal of criminal charges."  (internal citations omitted)).

{45}    Just as the district court does not "impose SORNA provisions or have discretion to modify them," the court does not have the power to stay a defendant's required compliance. Although counsel was required to advise Defendant regarding the collateral SORNA consequences of a potential plea, *see State v. Edwards*, 2007-NMCA-043, ¶ 31, 141 N.M. 491, 157 P.3d 56, just as counsel is required to advise a client of collateral deportation consequences, *see id.* ¶ 26 (citing *State v. Paredez*, 2004-NMSC-036, ¶ 18, 136 N.M. 533, 101 P.3d 799), that responsibility does not relate to a court's power to stay those consequences.

**CONCLUSION**

{46}    We reverse *Myers III* and remand this case in its entirety to the district court for further proceedings consistent with this Opinion.

{47}    **IT IS SO ORDERED.**

_____
**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____
**CHARLES W. DANIELS, Chief Justice**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for *State v. Myers*, Docket No. 32,126**

| CT | CONSTITUTIONAL LAW |
|----|--------------------|
| CT-EX | Ex-Post Facto |
| CT-VO | Vague or Overbroad |
| CT-DU | Due Process |

| | |
|---|---|
| **CL** | **CRIMINAL LAW** |
| CL-FE | Felony |
| CL-OB | Obscenity |
| CL-SE | Sexual Exploitation of Children |
| CL-SX | Sexual Offenses |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-DS | Deferred Sentence |
| CA-DU | Due Process |
| CA-EO | Elements of Offense |
| CA-SN | Sentencing |
| | |
| **JG** | **JUDGES** |
| JG | Judicial Authority |
| | |
| **ST** | **STATUTES** |
| ST-AP | Applicability |
| ST-CN | Constitutionality |