The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: March 4, 2024

**NO. S-1-SC-38300**

**STATE OF NEW MEXICO,**

     Plaintiff-Petitioner,

v.

**DAVID RAEL,**

     Defendant-Respondent.

**ORIGINAL PROCEEDING OF CERTIORARI**
**Mary L. Marlowe Sommer, District Judge**

Hector H. Balderas, Attorney General
Marko David Hananel, Assistant Attorney General
Santa Fe, NM

for Petitioner

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellee

# OPINION

**VIGIL, Justice.**

{1}     This appeal arises from a prosecution under the Sexual Exploitation of Children Act (the Act), NMSA 1978, §§ 30-6A-1 to -4 (1984, as amended through 2016), legislation that this Court previously forecast would create its fair share of interpretative issues. *See State v. Myers*, 2011-NMSC-028, ¶¶ 1, 19, 150 N.M. 1, 256 P.3d 13 (stating that determining "the meaning of certain elements of the Act and applying the elements to differing fact situations" would prove "challeng[ing to] our courts"). We first discuss the relevant statutory provisions, as this sets the stage for our analysis and conclusions.

{2}     Pornography is defined as a *prohibited sexual act*[1] which is depicted on a

---

[1]Section 30-6A-2(A) ("[*P*]*rohibited sexual act* means:
(1) sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex;
(2) bestiality;
(3) masturbation;
(4) sadomasochistic abuse for the purpose of sexual stimulation; or
(5) lewd and sexually explicit exhibition with a focus on the genitals or pubic area of any person for the purpose of sexual stimulation.")

*visual or print medium*[2] and is *obscene*.[3] *Black's Law Dictionary* (11th ed. 2019) 1405 (defining *pornography*). When a child under eighteen years of age is depicted, it is child pornography. *See id.* Consistent with the purpose of the Act to protect children from "the harm to the child that flows from trespasses against the child's dignity when treated as a sexual object," *State v. Myers*, 2009-NMSC-016, ¶ 17, 146 N.M. 128, 207 P.3d 1105 (internal quotation marks and citation omitted), Section 30-6A-3 makes it a crime to possess, distribute, or manufacture child pornography.[4]

---

[2]Section 30-6A-2(B) ("[*V*]*isual or print medium* means:
    (1) any film, photograph, negative, slide, computer diskette, videotape, videodisc or any computer or electronically generated imagery; or
    (2) any book, magazine or other form of publication or photographic reproduction containing or incorporating any film, photograph, negative, slide, computer diskette, videotape, videodisc or any computer generated or electronically generated imagery.")

[3]Section 30-6A-2(E). ("[*O*]*bscene* means any material, when the content if taken as a whole:
    (1) appeals to a prurient interest in sex, as determined by the average person applying contemporary community standards;
    (2) portrays a prohibited sexual act in a patently offensive way; and
    (3) lacks serious literary, artistic, political or scientific value.")

[4]Section 30-6A-3 was amended following the pertinent events of this case. *See* 2016 N.M. Laws, ch. 2, § 1. The 2016 amendments, including those adding a subsection and relettering others, do not affect our substantive analysis. For clarity and ease of reference, we refer to the current version of the statute throughout this opinion. For simplicity's sake, we will use the term "child pornography" in describing crimes of sexual exploitation of children defined in Section 30-6A-3.

{3} Section 30-6A-3(A) criminalizes the possession of child pornography, as a fourth-degree felony, and Section 30-6A-3(C) criminalizes the distribution of child pornography, as a third-degree felony. In identical language, these two subsections make it a crime to "intentionally possess" or "intentionally distribute" pornography

> if that person *knows or has reason to know* that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person *knows or has reason to know* that one or more of the participants in that act is a child under eighteen years of age.

Section 30-6A-3(A), (C) (emphases added).

{4} The most serious of the child pornography crimes is found in Section 30-6A-3(E), which provides that it is a second-degree felony to manufacture child pornography. Section 30-6A-3(E) provides, in pertinent part,

> It is unlawful for a person to intentionally manufacture any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if one or more of the participants in that act is a child under eighteen years of age.

The Act elsewhere broadly defines the term "manufacture" to mean "the production, processing, copying by any means, printing, packaging or repackaging of any [prohibited] visual or print medium." Section 30-6A-2(D).

{5} The statutory element "knows or has reason to know," which is required for possession and distribution, is not an element of manufacturing. The absence of this element makes for the core issue in this case: under the Act, what is the statutory

3

mental state or mens rea requirement for manufacturing? The Court of Appeals engrafted the "knows or has reason to know" element onto the crime of manufacturing child pornography. *State v. Rael*, 2021-NMCA-040, ¶ 32, 495 P.3d 598. We reject this construction of Section 30-6A-3(E) and hold that the mens rea for manufacturing child pornography consists of "intentionally" manufacturing pornography that "intentionally" depicts a child under eighteen years of age and that in fact depicts a child that is under eighteen years of age. *See* § 30-6A-3(E).

{6}     The Court of Appeals also held that the State presented insufficient evidence of Defendant's mens rea to support Defendant's convictions. *Rael*, 2021-NMCA-040, ¶¶ 41-51. We disagree with this conclusion as well.

{7}     Accordingly, we reverse the Court of Appeals and reinstate Defendant's convictions.

**I.      BACKGROUND**

**A.      Factual Background and District Court**

{8}     Defendant was initially charged in a criminal information filed in the district court with four counts of manufacturing child pornography, one count of distributing child pornography, and one count of possession of child pornography. One count of manufacturing child pornography was dismissed at the start of the trial, and the trial went to the district court in a bench trial without a jury. After the bench trial the

district court filed findings of fact and conclusions of law, concluding that the "State proved beyond a reasonable doubt Defendant's guilt" of all remaining charges. Defendant was sentenced to a total of thirty-one and one-half years, with all counts to run concurrently, resulting in an actual sentence of nine years in the Department of Corrections.

{9} The evidence presented was as follows. The New Mexico Attorney General's Office operates the New Mexico Internet Crimes Against Children Task Force (the Task Force). Special Agent Owen Peña works for the Task Force and testified that the Task Force conducts undercover online investigations of peer-to-peer, file-sharing networks. He was qualified by the court as an expert witness in peer-to-peer investigations and testified as follows.

{10} Peer-to-peer, file-sharing networks allow people to share files with others on the same network, with each computer in the network serving as both a terminal to download materials and as a server for other computers to download materials. Such networks are popular and legal except when they are used for the illegal distribution of materials such as child pornography. To use a file-sharing network, the user must download the file-sharing software—relevant here is DownloadHQ—and then share

files to continue accessing the network.[5] When accessing files, DownloadHQ has a preview window that allows users to view, or watch, a portion of the video file before selecting which files to download.

{11} When conducting investigations, the Task Force uses specialized software to search the file-sharing networks and locate individuals sharing child pornography. This is accomplished by using common search terms to locate suspected child pornography files and then comparing a suspected file's "hash values" to those of known child pornography files in a database. *See State v. Knight*, 2019-NMCA-060, ¶ 4, 450 P.3d 462 ("[H]ash values . . . are alphanumeric values assigned to every unique file."). Once confirmed that a suspected file contains hash values matching known child pornography, the software then selects the user sharing the content and determines the Internet Protocol (IP) address and general geographic location.

{12} Special Agent Peña testified that while he was conducting an investigation, the software identified an IP address in New Mexico sharing files with hash values matching potential child pornography. The IP address belonged to Defendant. Special Agent Peña detailed how he made a direct connection to Defendant's computer, browsed the files listed in Defendant's shared files folder, and

---

[5]DownloadHQ is a version of the file-sharing program Ares. Witnesses and trial counsel referred to DownloadHQ and Ares interchangeably. For consistency, we use DownloadHQ throughout this opinion.

downloaded one of the files. The downloaded file was named "(pthc)black gay man fucking a 13 year old boy (hot!!)" ("thirteen-year-old-boy" video). According to Special Agent Peña, the acronym "pthc" in the file name stands for "pre-teen hardcore." Special Agent Peña reviewed the downloaded file and confirmed it was child pornography. Defendant later stipulated at trial that the "thirteen-year-old-boy" video contains "prohibited sexual acts as defined in Section 30-6A-2(A)(1)" and is "obscene as that term is defined in Section 30-6A-2(E)."

{13}    Special Agent Peña obtained a grand jury subpoena allowing him to get subscriber information for the IP address. He forwarded that information to Sergeant (now Commander) Oliver Morris of the Los Alamos Police Department who determined that Defendant's physical address was associated with the IP address. Commander Morris then obtained a search warrant which he executed with Special Agent Peña. During the search, a Gateway computer and a Toshiba external hard drive were seized from Defendant's bedroom.

{14}    Special Agent Peña testified that during the execution of the search warrant, the Gateway computer had DownloadHQ running, and searches for "teen sex" and "extreme sex" were active. Special Agent Peña further testified that the username for the DownloadHQ account on the computer was the same username Defendant previously used to download the "thirteen-year-old-boy" video. He explained that

when Defendant downloaded files, they were directed to the C.drive "downloads" folder in the Gateway computer instead of the default DownloadHQ folder. Defendant therefore knew where the downloaded files were stored since he changed where the downloads were automatically directed. Special Agent Peña added that Defendant modified the software settings so that, using the software, he could make five uploads and fifteen downloads at once. Finally, Special Agent Peña testified that when OS Triage—a program that allows law enforcement to do an onsite preview of the data on a computer—was run on the Gateway computer, it showed several child pornography related searches in the browser history and that the search-term keyword "young" had been used.

{15}    After the search warrant was executed, Defendant agreed to an interview with Commander Morris and Special Agent Peña at the Los Alamos Police Department. Before the interview, Defendant stated he understood his *Miranda* rights and signed a *Miranda* waiver form. The interview was video-recorded, and it took place before the Gateway computer and Toshiba external hard drive were forensically examined. At trial, the seventy-eight-minute video-recorded interview was admitted into evidence without objection.

{16}    Throughout that interview, Defendant made several admissions. Defendant said he was the owner of the Gateway computer and the Toshiba external hard drive.

Defendant admitted he was generally the exclusive user of the Gateway computer, he was "pretty much" responsible for its contents, his roommates did not know the password to the computer, his internet was secured by a username and password, and he used CCleaner—an antiforensic program—daily. Defendant described how he was somewhat familiar with computers and that he would help friends who were having computer issues. Defendant also stated that he was familiar with DownloadHQ which he had been using for about two and one-half years. He understood it was a program used to share files in that he would select files to download from other users and that other users would initiate uploads of files from his computer. He knew child pornography was illegal.

{17}    In general, Defendant claimed that if the file name of a video suggested it contained child pornography, he would not download it. When questioned about the child pornography files on his computer, Defendant admitted to having opened and viewed files containing child pornography; however, he claimed that he deleted the files after determining their content. Special Agent Peña asked Defendant why he would download the files in the first place, and Defendant responded that the files must have been under a different file name. Special Agent Peña then read off the file names for some of the files found in Defendant's shared file folder. These included "2 brothers fucking 14 year old sister," "2 girls 2 14 15 yo fucking hardcore" and

9

"maverick men two fucking bitching boy in bathroom." Special Agent Peña asked Defendant, "Don't you think you would've got rid of those ones?" and Defendant responded, "I thought I did." Special Agent Peña informed Defendant that all told, there were thirty-seven suspected child pornography files linked to his DownloadHQ account. Defendant again responded that they must have been under different file names. Later in the interview, Defendant claimed that if child pornography files were still on his computer, it was because at times he would get drunk, "pass out," and forget to delete them.

{18}    With regard to his search history, Defendant admitted to using certain search terms, which included "teen," and stated that "there's probably search stuff in there but I don't typically look at child [pornography]." Defendant nevertheless admitted that he had, at various times, inadvertently downloaded child pornography, but upon watching them and learning they depicted children, he turned them off before any sex acts occurred and deleted them.

{19}    Defendant offered two examples of videos he claimed to have deleted immediately upon learning children were involved: a video showing three naked thirteen-year-old girls dancing and a video of a naked girl in a bathtub. These two videos that Defendant described matched the videos we refer to herein as the "Alicia" video, and the "lingerie" video. Finally, Defendant admitted that he

recognized the file name "KitKatClub," but maintained that he recalled the video as being adult pornography and not child pornography.

{20} After the interview, Defendant's Gateway computer and Toshiba external hard drive were taken to the Regional Computer Forensics Laboratory for forensic analysis. Detective Christopher Brown of the New Mexico Regional Computer Forensics Laboratory conducted the forensic analysis. He was qualified by the court as an expert in computer forensics and testified as to the results. His testimony related to the "Alicia" video and the "lingerie" video, which Defendant admitted he watched, and a third video referred to at trial as the "Kimmy" video. Detective Brown testified that all three videos contain child pornography. These videos are the basis for Defendant's three convictions for manufacturing child pornography. As pertains to the file names, Detective Brown testified that three terms are particularly indicative of child pornography: "pthc" and "ls" and "lolita."

{21} The "Alicia" video is named "!fuckingdaughteralicia(3)(2)256.mpg." Detective Brown testified that the video is in two folders on the Toshiba external hard drive and that it was downloaded on two separate dates: March 15, 2013, and April 5, 2013. Detective Brown confirmed that the "Alicia" video depicts "a young prepubescent female starting out in a tub, and it eventually transitions to her being naked and, I believe, performing an act of oral sex" on an adult male.

11

{22}    The "lingerie" video is named "(ls-magazine-ls-models lsm-07-01-02-bonus-red lingerie 11y 12y 13y-video.avi." Detective Brown testified that this video is on the Toshiba external hard drive and that artifacts from the video were found on the Gateway computer. Forensic evaluation indicated the video was viewed on the Gateway computer and stored on the internal hard drive. The video begins with three naked girls dancing and touching each other's genitals. Special Agent Peña testified that two of the girls are prepubescent and one of the girls is pubescent but still very young. Early in the video, the camera focuses on the genital area of a prepubescent girl.

{23}    The "Kimmy" video is named "(pthc lolifuck) kimmy-superbig cock fucking little girl.avi." Detective Brown said this video is in two folders on the Toshiba external hard drive: part of the path to one folder included "davidhome," and part of the path to the other included "porn." The video also had two different download dates: May 22, 2013, and May 29, 2013. Detective Brown testified that this video depicts a female child being vaginally penetrated by an adult male.

{24}    Next, Detective Brown testified about the video Defendant recalled during his interview with Special Agent Peña and Commander Morris—the "KitKatClub" video. The video served as the basis for Defendant's charge of possession of child pornography. The "KitKatClub" video, named "xxx - kitkat club avantgarde extreme

12

8.mpg," depicts a "small child, and there is a male rubbing her genital area." Detective Brown testified that forensic evidence indicated it was downloaded by Defendant on June 15, 2013, using DownloadHQ and stored on the Gateway computer hard drive.

{25} Detective Brown also testified about the "thirteen-year-old-boy" video investigated by Special Agent Peña, which was the basis for the charge of distributing child pornography. Although he could not locate the video on any of Defendant's devices, Detective Brown testified that other forensic evidence revealed that the video was downloaded using DownloadHQ onto the Gateway computer at some point. Detective Brown explained that the DownloadHQ application kept an encrypted log of files downloaded and shared, and that the log included the "thirteen-year-old-boy" video file name, "(pthc)black gay man fucking a 13 year old boy (hot!!) 314.avi." When asked how the "thirteen-year-old-boy" video could have been downloaded but not found on any of Defendant's devices, Detective Brown clarified that the video may have been deleted and overwritten or deleted and antiforensic programs may have been run to remove traces of it.

{26} Detective Brown testified that he was able to recover and decrypt from Defendant's DownloadHQ application a partial list of names of the files downloaded to Defendant's Gateway computer, together with a partial list of names of the files

13

Defendant made available to others through the DownloadHQ application. Detective Brown read the following names of the downloaded files recovered: (1) "Virgin sex after school 13," (2) "pthc black gay man fucking a 13 year old boy hot!!314" (consistent with the file named in Defendant's conviction for distributing child pornography), (3) "pthc 11 year whores to 15 year 2 mpeg3GP," (4) "2 brothers fucking 14 year old sister!", (5) "kitkat club avant-garde extreme 8" (consistent with the file named in Defendant's conviction for possession of child pornography), and (6) "2 girl 2 15 and 14 years fucking hardcore." Detective Brown also read recovered names of files that were shared: (1) "pthc 2010 15 year fucking my sister excellent," (2) "fucking my cute 15 year old sister porn sex xxx fuck suck anal 2," (3) "maria teen young preteen fuck Lolita sex full version," and (4) "young student girl fucked Lolita teen porn rape sex nude queen william edward 1."

{27} Detective Brown concluded his testimony with an explanation of the CCleaner program, an "anti-forensic program" that is generally used by people who do not want their information seen or recovered. It is an antiforensic program that is "directed to go and delete files in a way that they should not be able to be recovered." He testified CCleaner was on the Gateway computer and that it "had been run recently" and previously "thousands of times." Defendant said in his interview that he used the cleaner "every day." Detective Brown also testified that CCleaner

14

included advanced settings for deleting certain data and that Defendant's CCleaner was configured to target certain DownloadHQ search terms. The few search terms that he recovered included "xxx," "young cheerleaders," and "teen sex."

{28}    The defense then called its only witness, Steven Gary Burgess, who was qualified by the court as an expert in computer forensics. Mr. Burgess testified that he located "several hundred" videos on the hard drive of the Gateway computer and the Toshiba external hard drive of which three or four were "illicit videos."

{29}    Of the files that contained "illicit videos," Mr. Burgess testified there was no indication that those files had been viewed. Granted, this was based off the media players on the Gateway computer itself, not the media player within DownloadHQ. Mr. Burgess also testified that he recovered eleven thousand DownloadHQ search terms from the Gateway computer and examined them for five search terms that were indicative of child pornography. Mr. Burgess testified that none of the common child pornography search terms appeared in the search history. Mr. Burgess concluded that the search terms used were not indicative of searching for child pornography but instead "would be used for any kind of pornography."

{30}    Mr. Burgess also testified about the programs found on the Gateway computer. He testified that although he had only used DownloadHQ a few times, it is generally possible for a user to download a multitude of files at once, making it

possible for a person to download a file without knowing its contents. Mr. Burgess stated that he believed a program called Backup Now was being used on the Gateway computer and that it allows users to back up or copy an entire volume of files without having to individually select each file. Finally, Mr. Burgess testified that he did not "find any evidence proving that CCleaner had been used."

{31} The district court convicted Defendant of one count of possession of child pornography (the "KitKatClub" video), one count of distribution of child pornography (the "thirteen-year-old-boy" video), and three counts of manufacturing child pornography by copying (the "Alicia" video, the "lingerie" video, and the "Kimmy" video). All three of the manufacturing counts were based on Defendant copying the videos from the Gateway computer to the Toshiba external hard drive.

{32} Defendant appealed, requesting that the Court of Appeals clarify the necessary elements for each of his convictions and challenging the sufficiency of the evidence to support his convictions. *Rael*, 2021-NMCA-040, ¶ 1.

**B.     Court of Appeals**

{33} The Court of Appeals noted that the "knows or has reason to know" element contained in Section 30-6A-3(A) and (C) for the crimes for possession and distribution of child pornography is absent from the statute for the crime of the manufacture of child pornography, § 30-6A-3(E). *Rael*, 2021-NMCA-040, ¶ 27.

16

This distinction, the Court of Appeals said, could be an indication that the Legislature did not intend manufacturing child pornography to have any mens rea requirement because "the plain language [prohibiting the manufacture of child pornography] does not provide *any* scienter requirement." *Id*. Concluding that a legislative intent was not expressed in "unambiguous 'language negating a mental state,'" the Court of Appeals determined to look to other indicia of the Legislature's intent. *Id*. ¶¶ 27-28 (quoting *State v. Nozie*, 2009-NMSC-018, ¶¶ 26, 30, 146 N.M. 142, 207 P.3d 1119 (stating that the Court must determine whether "there is [a] clear intent on the part of the Legislature to omit a mens rea element" from a crime because it is presumed that criminal intent is an essential element of a crime)).

{34}     The "other indicia of legislative intent" which the Court of Appeals looked to were the severity of the punishment and whether reading Section 30-6A-3(E) (manufacturing) without the "knows or has reason to know" mens rea requirements of Section 30-6A-3(A) and (C) (possession and distribution) would lead to an absurd and unreasonable result. *Rael*, 2021-NMCA-040, ¶¶ 29-30. In addition, the Court of Appeals invoked the objective of avoiding challenges of unconstitutionality in its interpretation of Section 30-6A-3(E). *Id*. ¶ 31. The result was that the Court of Appeals inserted the "knows or has reason to know" element of the crimes of possession and distribution of child pornography into the elements of the crime of

manufacturing child pornography. *Id.* ¶¶ 22, 28-32. The Court of Appeals therefore determined that in addition to the other elements of manufacturing child pornography, the State is required to prove "[t]he defendant knew or had reason to know that [the] medium depicts [pornography]" and that "[t]he defendant knew or had reason to know that one or more of the participants in that act is a child under eighteen years of age." *Id.* ¶ 32.

{35} Turning its attention to the sufficiency of the evidence, the Court of Appeals determined that the State presented insufficient evidence that Defendant knew or had reason to know the videos contained child pornography. *Id.* ¶¶ 39, 43-44, 49-50. In other words, the Court concluded there was insufficient evidence to prove that Defendant acted with the mens rea required to convict him of possession, distribution, or the manufacture of child pornography. *Id.* ¶ 39. The Court of Appeals therefore reversed all of Defendant's convictions.

{36} We granted the State's petition for writ of certiorari which raises two questions: (1) what is the mens rea requirement for manufacturing child pornography, and (2) did the State present sufficient evidence of Defendant's mens rea to support Defendant's convictions.

## II.    DISCUSSION

{37}    We are first called upon to determine whether Section 30-6A-3(E), which prohibits the manufacture of child pornography, has a mens rea requirement, and if so, what that mental state is. Finally, we determine whether the evidence is sufficient to support the convictions.

## A.    Standard of Review and Rules of Statutory Interpretation

{38}    "Interpretation of a statute is a matter of law," as is the "determination of whether the language of a statute is ambiguous." *State v. Rivera*, 2004-NMSC-001, ¶ 9, 134 N.M. 768, 82 P.3d 939 (internal quotation marks and citations omitted). Our review is therefore de novo. *Id.*

{39}    Legislative intent is this Court's touchstone when interpreting a statute. *See State* v. *Padilla*, 2008-NMSC-006, ¶ 10, 143 N.M. 310, 176 P.3d 299. "The starting point in every case involving the construction of a statute is an examination of the language utilized by the Legislature in drafting the pertinent statutory provisions." *Rivera*, 2004-NMSC-001, ¶ 10 (brackets, internal quotation marks, and citation omitted); *see also* 2A Norman J. Singer & J.D. Shambie Singer, *Statutes & Statutory Construction* § 46:3 at 178 (7th ed. 2014) ("[C]ourts consider statutory text to be the best evidence of legislative intent or will.").

{40} As a "cardinal canon" of statutory interpretation, we presume "that a legislature says in a statute what it means and means in a statute what it says." *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). This and other linguistic canons serve as "aids for analyzing [a statute's] text and context [and providing] 'guides to solving the puzzle of textual meaning.'" *Kisor v. McDonough*, 995 F.3d 1347, 1349 & n.3 (Fed. Cir. 2021) (Prost, C.J., concurring) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 59 (Thomson West 2012). The consideration of linguistic canons is not a step beyond a plain-meaning analysis but is part and parcel of such an analysis. *See, e.g., Thomas v. Reeves*, 961 F.3d 800, 823 (5th Cir. 2020) (mem.) (en banc) (per curiam) (Willett, J., concurring in the judgment) (determining the statutory meaning to be clear based on the application of linguistic canons).

{41} Further, where "a statute contains language which is [determined to be] unambiguous, we must give effect to that language and refrain from further statutory interpretation," *Rivera*, 2004-NMSC-001, ¶ 10 (internal quotation marks and citation omitted), at least where our plain-meaning interpretation does not "lead to injustice, absurdity, or contradiction." *Padilla*, 2008-NMSC-006, ¶ 7 (internal quotation marks and citation omitted). In such circumstances, the first and foremost interpretative canon identified in *Germain*—that a legislature is presumed to say

what it means and mean what it says—"is also the last: judicial inquiry is complete." 503 U.S. at 253-54 (internal quotation marks and citations omitted); *accord United States v. Browne*, 505 F.3d 1229, 1250 (11th Cir. 2007) (allowing that when "construing a criminal statute, we begin with the plain language" and go no further absent ambiguous language).

**B.    The Mens Rea for Manufacturing Child Pornography**

{42}    "Typically, criminal liability is premised upon a defendant's culpable conduct, the *actus reus*, coupled with a defendant's culpable mental state, the *mens rea*." *Padilla*, 2008-NMSC-006, ¶ 12. In order to determine what mens rea, if any, is required for manufacturing child pornography, we begin with the words of the statute. In pertinent part, Section 30-6A-3(E) states:

> It is unlawful for a person to intentionally manufacture any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if one or more of the participants in that act is a child under eighteen years of age.

The object of the statute is not to prohibit manufacturing pornography per se but to prohibit manufacturing pornography "if one or more of the participants . . . is a child under eighteen years of age." *Id.* In other words, the object of the statute is to prohibit manufacturing child pornography. Nonetheless, the statute is ambiguous as to the mens rea required to commit the crime of manufacturing child pornography. One reading of the statute is that it prohibits the act of "intentionally" manufacturing

21

pornography (i.e., "any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act") but that such prohibited manufacturing does not require "intentionally" depicting a child under eighteen years of age. Under this reading, if the pornography depicts a child under eighteen years of age, the crime is complete, regardless of the defendant's intent. This reading makes manufacturing child pornography a strict liability offense.

{43} Strict liability crimes are crimes "for which liability is imposed irrespective of the defendant's knowledge or intentions, that is, crimes without a mens rea requirement." Laurie L. Levenson, *Good Faith Defenses: Reshaping Strict Liability Crimes*, 78 Cornell L. Rev. 401, 417 (1993); *see State v. Harrison*, 1992-NMCA-139, ¶ 18, 115 N.M. 73, 846 P.2d 1082 ("A strict liability crime is one which imposes a criminal sanction for an unlawful act without requiring a showing of criminal intent."). Strict liability crimes generally arise from the legislative exercise of police powers to achieve some societal good, with relatively slight penalties. *Santillanes v. State*, 1993-NMSC-012, ¶¶ 26-27, 115 N.M. 215, 849 P.2d 358. On the other hand, crimes which require mens rea are those that punish conduct which warrants "moral condemnation and social opprobrium." *Id*. ¶ 27; *see Nozie*, 2009-NMSC-018, ¶ 26 (stating "moral condemnation and social opprobrium" typically do not attach to strict

liability crimes (internal quotation marks and citation omitted)). We reject reading manufacturing child pornography as a strict liability crime for two reasons.

{44} First, we do not assume that the Legislature intended to create a strict liability crime even if a criminal statute does not expressly set forth a mens rea requirement. *Santillanes*, 1993-NMSC-012, ¶ 11. Rather, we follow the well-established rule that we presume mens rea is a necessary element of the crime unless the statute clearly shows that the Legislature wanted to dispense with it. *Id*. This has been our rule in New Mexico since at least 1917. *State v. Gonzalez*, 2005-NMCA-031, ¶ 12, 137 N.M. 107, 107 P.3d 547 ("Since at least 1917, we have followed the common law that where an act is prohibited and punishable as a crime, it is construed as also requiring the existence of a criminal intent."). *See also Ruan v. United States*, 142 S. Ct. 2370, 2377 (2022) ("[W]hen we interpret criminal statutes, we normally start from a longstanding presumption, traceable to the common law, that [the legislature] intends to require a defendant to possess a culpable mental state." (internal quotation marks and citation omitted)). Our courts have construed a criminal statute to require criminal intent—knowledge—where none was expressed in the statute. *See, e.g.*, *State v. Ramos*, 2013-NMSC-031, ¶¶ 21, 24-25, 305 P.3d 921 (holding that although not expressed in the statute, violating an order of protection requires proof that a defendant knows of the order of protection and of the protected person's presence

within the protected zone); *Nozie*, 2009-NMSC-018, ¶ 30 (holding that although it is not expressed in the statute, knowledge that the victim is a police officer is an essential element of the crime of aggravated battery on a police officer); *State v. Valino*, 2012-NMCA-105, ¶¶ 15, 17, 287 P.3d 372 (holding that notwithstanding the absence of statutory language requiring it, knowledge that the victim is a health care worker is an essential element of the crime of battery on a health care worker); *State v. Gonzalez*, 2005-NMCA-031 ¶¶ 1, 18 (holding that despite no statutory expression requiring knowledge of contraband, a person entering a jail must knowingly possess contraband as an essential element of bringing contraband into a jail).

{45} We end this portion of our discussion by noting that the text of Section 30-6A-3(E) does not clearly express a legislative intent to dispense with a mens rea requirement for the crime of manufacturing child pornography—leaving as ambiguous the *extent* of the required mens rea. We nevertheless presume criminal intent is a necessary element of the crime.

{46} Second, a statute that prohibits manufacturing child pornography is unconstitutional if it is construed as a strict liability criminal offense. Where a statute is capable of being interpreted in two ways, one that is constitutional and one unconstitutional, we adopt the version that is constitutional. *State ex rel. State Engineer v. Romero*, 2022-NMSC-022, ¶ 16, 521 P.3d 56. Although child

24

pornography is not protected by the First Amendment of the United States Constitution, *see United States v. Williams*, 553 U.S. 285, 288 (2008), the power to criminalize child pornography does have limitations, *see id*. at 289. One limitation is that if a strict liability crime chills the exercise of free expression, it is unconstitutional. *Smith v. California*, 361 U.S. 147, 151-52 (1959). The *Smith* Court, anticipating that a bookseller facing strict criminal liability would be restricted in distributing constitutionally protected material, concluded that a bookseller without some "knowledge of the contents" of the allegedly obscene material could not be punished. *Id.* at 153. Similarly, in *New York v. Ferber*, 458 U.S. 747, 765 (1982), the Court explicitly ruled that while criminal statutes may constitutionally ban the sexually explicit depictions of minors, "criminal responsibility may not be imposed without some element of scienter on the part of the defendant." *Id*. However, the Court did not specify what level of mens rea is required.

{47} The statute in this case could be construed in two different ways. On the one hand, we might conclude that the statute prohibits *intentionally* producing pornography but does not require the producer to have *intentionally* depicted minors under eighteen years of age. That construction would be both unconstitutional and at odds with legislative intent. Our obligation is "to follow the well-established principle of statutory construction that statutes should be construed, if possible, to

25

avoid constitutional questions." *Romero*, 2022-NMSC-022, ¶ 16 (internal quotation marks and citation omitted).

{48} We therefore consider whether the crime of manufacturing child pornography requires both "intentionally" manufacturing pornography and "intentionally" depicting a child under eighteen years of age. We discern no grammatical or other obstacle to including "intentionally" in the depiction of a minor under eighteen years of age for the prohibited manufacture of child pornography. Textually, Section 30-6A-3(E) prohibits intentionally manufacturing pornography "if one or more of the participants in [the prohibited sexual] act is a child under eighteen years of age." The specific deterrent purpose of the statute is to prohibit manufacturing child pornography, and requiring an offender to have "knowingly" used the depiction of a child under the age of eighteen years of age for the manufactured pornography falls squarely within its specific deterrent purpose. *See Nozie*, 2009-NMSC-018, ¶ 30 (requiring knowledge that the victim is a police officer furthers the specific deterrent purpose expressed by the statute criminalizing battery on a police officer). Further, by presuming a legislative intent to require an offender's intent to depict a child under eighteen years of age, we avoid a construction rendering the statute unconstitutional.

{49} We therefore apply the expressed mens rea requirement of intent to both statutory elements: the intentional mental state attaches not only in the manufacturing but *also* in the depiction of a child under eighteen years of age. That is to say, the crime consists of the *actus reus* of intentionally manufacturing pornography coupled with the *mens rea* of intentionally depicting a child under eighteen years of age. Because manufacturing child pornography under Section 30-6A-3(E) requires "some element of scienter on the part of the defendant," *Ferber*, 458 U.S. at 765, Section 30-6A-3(E) complies with the First Amendment and is constitutional.

{50} Our construction of New Mexico's statute criminalizing the manufacture of child pornography is consistent with the United States Supreme Court's interpretation of the Protection of Children Against Sexual Exploitation Act of 1977, as amended, 18 U.S.C. § 2252. In *U.S. v. X-Citement Video, Inc.*, 513 U.S. 64, 66-67 (1994), the defendant challenged the constitutionality of 18 U.S.C. §§ 2252(a)(1)-(2), which prohibits "knowingly" transporting, shipping, receiving, distributing, or reproducing a visual depiction if it "involves the use of a minor engaging in sexually explicit conduct." The Court summarized the statute's legislative history as "persuasively indicat[ing] that Congress intended that the term 'knowingly' apply to the requirement that the depiction be of sexually explicit conduct" while it was "a

27

good deal less clear . . . that Congress intended that the requirement extend also to the age of the performers." *X-Citement*, 513 U.S. at 77. The Court warned that statutes "completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts." *Id.* at 78. Therefore, it was "incumbent upon [the *X-Citement* Court] to read the statute to eliminate those doubts so long as such a reading is not plainly contrary to the intent of Congress." *Id.* The Court relied upon the plain language of the statute and canons of statutory construction and concluded that the "knowingly" element applied to the conduct involved, the depiction of sexual content, and the age of the performers. *Id.* at 77-78; *see also Williams,* 553 U.S. at 294 (concluding that "knowingly" at the beginning of the federal pandering child pornography statute applied to all parts of the statute). "[A] scienter requirement as to the age of the performers" delineates the boundary between constitutionally protected speech and unprotected speech. *X-Citement*, 513 U.S. at 78.

{51}    We hold that the mens rea required to violate Section 30-6A-3(E) is (1) to intentionally manufacture pornography that (2) intentionally depicts a child under eighteen years of age. In addition, the pornography must, in fact, depict a child that is under eighteen years of age. Further, the mens rea requirements apply to all the methods for *manufacturing* as defined in Section 30-6A-2(D) (defining *manufacture*

28

as "the production, processing, copying by any means, printing, packaging or repackaging of any visual or print medium depicting any [pornography] or simulation of [pornography] if one or more of the participants in that act is a child under eighteen years of age"). We now evaluate the sufficiency of the evidence supporting Defendant's convictions for the possession, distribution, and manufacture of child pornography under Section 30-6A-3(A), (C) and (E).

## C.    Sufficiency of the Evidence

{52}    In evaluating the sufficiency of the evidence supporting Defendant's convictions, we must determine whether the evidence supports a finding that Defendant had the requisite mens rea to be convicted of possessing, distributing, and manufacturing child pornography. We conclude the evidence supports a finding that Defendant actually knew all the videos contained child pornography. Any discussion of whether he should have known is not necessary.

{53}    The Court of Appeals concluded Defendant's possession conviction was not supported by sufficient evidence that Defendant knew or had reason to know the "KitKatClub" video contained child pornography when he possessed it. *Rael*, 2021-NMCA-040, ¶ 42. The Court of Appeals reasoned that because the video's file name had no terms specific to child pornography, and although Defendant admitted to

29

knowing that a particular search *can* result in the return of child pornography, this was different from "knowing a search *will* return [child pornography]." *Id.* ¶¶ 41-42.

{54}    The Court of Appeals also concluded that there was insufficient evidence to support Defendant's distribution conviction because there was a lack of evidence suggesting he knew or had reason to know that the "thirteen-year-old-boy" video contained child pornography. *Id.* ¶ 44. This was because the file name of the video contained neither "the search terms that Defendant admitted using nor the terms that were actively being searched when law enforcement executed the search warrant." *Id.* The Court of Appeals elaborated, "While the full title to the ["thirteen-year-old-boy"] video suggests that it depicts an underage person as a participant in a prohibited sexual act, the State did not present any evidence that Defendant was familiar with the video's full title or content when he distributed it." *Id.*

{55}    Last, applying its "knows or has reason to know" mens rea requirements of Section 30-6A-3(A) to Defendant's convictions for manufacturing child pornography under Section 30-6A-3(E), the Court of Appeals concluded that there was insufficient evidence that Defendant knew or had reason to know that the "Alicia" video, the "lingerie" video, or the "Kimmy" video contained child pornography when each copy was made. *Rael*, 2021-NMCA-040, ¶¶ 45, 50. The Court of Appeals again reasoned that this was because the three digital video file

names did not contain "any of the search terms Defendant admitted to using" and because "the State did not present any evidence that Defendant was familiar with the title[s] or content" of the files. *Id.* ¶¶ 48-50.

{56}    Seeking affirmance of the Court of Appeals, Defendant argues that no rational factfinder could have found the evidence sufficient to prove beyond a reasonable doubt that he intentionally possessed, distributed, or manufactured the child pornography videos found on his computing devices or that he knew or had reason to know of the videos' contents. Defendant maintains that the presence of the unlawful videos on his digital devices and his conduct in downloading, sharing, and copying the videos were the products of mere "inadverten[ce]" and "happenstance" and thus were beyond the scope of Section 30-6A-3. However, as will be shown, Defendant's assertions of "accidental conduct" ring hollow in light of the persuasive circumstantial evidence presented at trial.

**1.    Standard of review**

{57}    In assessing the sufficiency of the evidence presented in a bench trial, the appellate court's role is well settled.

> First it reviews the evidence [resolving all conflicts and indulging all permissible inferences] with deference to the findings of the trial court; then it determines whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt.

31

*Myers*, 2009-NMSC-016, ¶ 13 (alteration in original) (citation omitted). Regardless of the type of trial involved—bench or jury trial—appellate review remains highly deferential because the reviewing court "resolve[s] all disputed facts in favor of the State, indulge[s] all reasonable inferences in support of the verdict, and disregard[s] all evidence and inferences to the contrary." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted); *see also State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (cautioning an appellate court to refrain from "second-guess[ing] the [factfinder's] decision concerning the credibility of witnesses, reweigh[ing] the evidence, or substitut[ing] its judgment for that of the [factfinder]" (alterations 1, 3, and 4 in original) (internal quotation marks and citation omitted)). So long as a rational factfinder "*could* have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset [the factfinder's] conclusions." *Id.* (internal quotation marks and citation omitted).

**2.      Defendant's mens rea was proven by sufficient evidence**

{58}    "Evidence is sufficient to sustain a conviction when there exists substantial evidence of a direct or circumstantial nature to support a verdict beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Smith*, 2016-NMSC-007, ¶ 19, 367 P.3d 420 (internal quotation marks and citation omitted).

"Substantial evidence," in turn, "is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Largo*, 2012-NMSC-015, ¶ 30 (internal quotation marks and citation omitted).

{59}    It is also settled that the "determination of the weight and effect of the evidence, including all reasonable inferences to be drawn from both the direct and circumstantial evidence, is a matter reserved for the determination of the trier of facts." *State v. Bloom*, 1977-NMSC-016, ¶ 5, 90 N.M. 192, 561 P.2d 465. In cases where a defendant's intent is at issue, but there is no admissible expression of intent by the defendant, the factfinder is required to draw reasonable inferences from all the evidence and surrounding circumstances to determine whether that defendant acted with a criminal intent. *See State v. Green*, 1993-NMSC-056, ¶ 21, 116 N.M. 273, 861 P.2d 954 (stating that intent "can seldom be proven by direct evidence"); *Holguin v. Sally Beauty Supply Inc.*, 2011-NMCA-100, ¶ 22, 150 N.M. 636, 264 P.3d 732 (stating that intent "must ordinarily be proved circumstantially by inferences from the facts and circumstances of each case" in the absence of a voluntary statement of the requisite intent by a mentally competent defendant). This is another way of saying, "A material fact may be proven by inference." *State v. Brown*, 1984-NMSC-014, ¶ 12, 100 N.M. 726, 676 P.2d 253.

{60} Evaluated under the foregoing principles and our standard of review, the evidence is overwhelming that Defendant intended his possession, distribution, and manufacture and knew that all five of the videos he was convicted of possessing, distributing, or manufacturing depicted child pornography.

{61} Defendant admitted he was the owner and exclusive user of the Gateway computer and the Toshiba external hard drive. He was familiar with DownloadHQ, which he had been using for two and one-half years to share files. He would select files to download from other users, and other users would initiate uploads of files from his computer. In order to obtain files, Defendant would enter search terms, and a responsive list was produced. The OS Triage program, which allows law enforcement to do an onsite preview of data on a computer, showed several child-pornography-related searches in the browser history of Defendant's Gateway computer. From the list produced by the search terms, Defendant would determine which files to download to his Gateway computer. DownloadHQ has a preview window that allows users to view a portion of the video prior to selecting which files to download. Defendant redirected his downloads from the default DownloadHQ folder to the C drive "downloads" folder in the Gateway computer. All told, there were thirty-seven suspected child pornography files linked to Defendant's DownloadHQ account. Forensic analysis of Defendant's DownloadHQ application

34

also retrieved a partial list of file names downloaded to the Gateway computer and a partial list of files Defendant made available to others through the DownloadHQ application. Each of the file names of these downloads and uploads had terms descriptive of child pornography. In the foregoing context, we now turn to the specific videos at issue.

{62} Defendant was convicted for possessing the "KitKatClub" video which, without dispute, depicts child pornography. It is one of the videos Defendant admitted in his interview that he watched and downloaded but claimed it contained adult pornography. Defendant also claimed he deleted the video when he learned that children were involved. However, forensic evidence indicated that the "KitKatClub" video was stored on the Gateway computer hard drive. Defendant's viewing the video, choosing to download the video, and redirecting where the video was to be stored in the Gateway computer are all circumstances from which a factfinder could reasonably conclude that Defendant intentionally possessed the "KitKatClub" video, knowing it contained child pornography. *See State v. Flick*, 790 N.W.2d 295, 305-06 (Mich. 2010) (contrasting the accidental conduct of one who views an "unsolicited depiction" of child pornography on a computer screen and immediately "undert[akes] efforts to remove the depiction" from the intentional conduct of one who takes "many . . . affirmative steps . . . to gain actual physical

control" of child pornography and knowingly possesses it). The fact that the file name of the video has no terms specific to child pornography, which the Court of Appeals said was determinative, *Rael*, 2021-NMCA-040, ¶¶ 41-42, does not negate these facts.

{63} Defendant's conviction for distributing child pornography arises from Special Agent Peña's discovery during his investigation that the DownloadHQ application in Defendant's computer was distributing the "thirteen-year-old-boy" video. The Court of Appeals reversed this conviction because it concluded there was no evidence that Defendant was familiar with the video's file name or content when it was distributed. *Id.* ¶ 44. We disagree. Again, there is no dispute that the video depicts child pornography. Although the video was not located on Defendant's computer or hard drive, forensic evidence revealed that the video was downloaded to Defendant's Gateway computer using the DownloadHQ application. Forensic evidence also revealed an encrypted log of files downloaded and shared, and the log included the "thirteen-year-old-boy" video file name. The evidence therefore shows that as a result of Defendant entering search terms, DownloadHQ produced a list of files, and from that list, Defendant chose to download the "thirteen-year-old-boy" video to his computer. There is no dispute that the file name contains terms specific to child pornography, and a fair inference is that Defendant knew what the file name

was when he downloaded it. Defendant also knew that the DownloadHQ application would then share that file with other users of the DownloadHQ application. From this evidence, and reasonable inferences from that evidence, a factfinder could reasonably conclude that Defendant intentionally distributed the "thirteen-year-old-boy" video knowing it contained child pornography.

{64} We now turn to Defendant's convictions for manufacturing child pornography by copying three videos of child pornography from his Gateway computer to his Toshiba external hard drive. These are the "Alicia" video, the "lingerie" video, and the "Kimmy" video. The Court of Appeals reversed these convictions, concluding that there was no evidence that Defendant was familiar with the file names or content of the videos. *Rael*, 2021-NMCA-040, ¶¶ 48-50. Again, we disagree. The "Alicia" video is the second video Defendant admitted in his interview that he downloaded but claimed he deleted upon seeing it depicted children. There is no dispute that it depicts child pornography. Further, the file name of the "Alicia" video has terms specific to child pornography, and the evidence is that it was copied on two separate dates from Defendant's Gateway computer to Defendant's Toshiba external hard drive. The "lingerie" video also depicts child pornography. Forensic evidence showed it was viewed from the Windows Media Player on Defendant's Gateway computer, kept on the internal hard drive, and copied to Defendant's Toshiba

external hard drive. The "Kimmy" video depicts child pornography, and its file name contains terms specific to child pornography. It was copied from Defendant's Gateway computer to Defendant's Toshiba external hard drive on two different dates. This evidence, and reasonable inferences from the evidence are sufficient for a factfinder to reasonably conclude that Defendant intentionally copied these videos with the intent to copy child pornography because he knew they depicted child pornography.

{65}     Two additional factors are supportive of our conclusion that Defendant knew all five videos contained child pornography.

{66}     First, Defendant said he used CCleaner daily, and Detective Brown confirmed it "had been run recently" and previously "thousands of times." Detective Brown explained it is "used by a lot of people that generally do not want their information being recovered or seen" as it is an antiforensic program that is "directed to go and delete files in a way that they should not be able to be recovered." He further explained that Defendant's CCleaner was configured to target certain DownloadHQ search terms. In fact, when asked how the "thirteen-year-old-boy" video may have been downloaded but not found on any of Defendant's devices, Detective Brown explained that the video may have been deleted and overwritten or deleted and antiforensic programs may have been run to remove traces of it. In addition,

Detective Brown testified that he was able to recover and decrypt a partial list of file names downloaded to Defendant's Gateway computer and shared from Defendant's Gateway computer using Defendant's DownloadHQ application and that the names of all those files contained terms specific to child pornography. Defendant knows child pornography is illegal. Defendant's daily use of CCleaner, his downloads of videos named for and containing child pornography, and his use of search terms specific to child pornography is a combination fatal to Defendant's argument that he did not know the videos he was convicted of possessing, distributing, and copying depicted child pornography. *See United States v. Clark*, 24 F.4th 565, 576-77 (6th Cir. 2022) (relying, in part, on the defendant's use of "two evidence destruction programs" on his computer in concluding that the defendant "knowingly distributed illegal images and videos . . . on a peer-to-peer network"); *State v. Schuller*, 843 N.W.2d 626, 637 (Neb. 2014) ("It seems reasonable to infer that [the defendant] deleted the files to hide evidence of his earlier knowing possession [of child pornography].").

{67} Second, Defendant's credibility was tested and contradicted in several material respects. Defendant claimed that if the file name of a video suggested it contained child pornography, he would not download it. But, when confronted with the fact that the shared folder in his computer had files with names clearly stating

they contained child pornography, Defendant claimed he thought he had deleted them. Defendant then claimed that files might not have been deleted because sometimes he got drunk, passed out, and forgot to delete them. He also admitted he downloaded child pornography files but claimed he deleted those files after determining their content. Another time he claimed that upon learning videos depicted children, he turned them off before any sex acts occurred and deleted them. The district court as the factfinder was not required to give any credibility to Defendant's explanations. *State v. Jason L.*, 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856 ("Conflicts in the evidence, even within the testimony of a witness, are to be resolved by the fact finder at trial."). The fact that the district court convicted Defendant establishes that it rejected Defendant's explanations and excuses, and on appeal we are not free to reweigh the evidence and come to a contrary conclusion by accepting those explanations and excuses as true. *State v. Garcia*, 2011-NMSC-003, ¶ 5.

{68}   For the foregoing reasons, we conclude that the evidence supports findings that Defendant (1) intentionally possessed the "KitKatClub" video, knowing that it depicts pornography and knowing that one of the participants is a small child, under eighteen years of age; (2) intentionally distributed the "thirteen-year-old-boy" video, knowing that it depicts pornography and knowing that one of the participants it

40

depicts is a young boy under eighteen years of age; and (3) intentionally manufactured child pornography by copying the "Alicia" video, the "lingerie" video, and the "Kimmy" video, intending for all the copies to depict a child or children under eighteen years of age. We therefore affirm Defendant's convictions.

## III.	CONCLUSION

{69}	The opinion of the Court of Appeals is reversed. The case is remanded to the district court for enforcement of the judgment and sentence it imposed.

{70}	**IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

_____
**C. SHANNON BACON, Chief Justice**

_____
**DAVID K. THOMSON, Justice**

_____
**BRIANA H. ZAMORA, Justice**

_____
**BRETT R. LOVELESS, Judge**
**Sitting by designation**

41