# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3539-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES A. SIMMONS,

     Defendant-Appellant.

_____

Argued May 13, 2025 – Decided August 14, 2025

Before Judges Gooden Brown and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-10-1340.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Lila B. Leonard, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Lila B. Leonard, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of second- and third-degree child endangerment by possessing, viewing, maintaining, and storing child pornography using a file-sharing program. He was sentenced to an aggregate term of eight years in prison and a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4. He was also ordered to comply with the provisions of Megan's Law, N.J.S.A. 2C:7-1 to -23.

The convictions stemmed from an internet-crimes against children investigation that uncovered child sexual exploitation and abuse material (CSEAM) on defendant's electronic devices at his residence. At trial, investigators described the processes and programs used to forensically analyze defendant's devices to determine which ones contained CSEAM. The defense theory was that the CSEAM belonged to defendant's son who had died by suicide years earlier. Defendant testified that in search of the motivation for his son's suicide, he had copied the files from his son's computers onto his own electronics but never had time to look through them because he was caring for his ailing wife.

On appeal, defendant raises the following points for our consideration:

POINT I

THE FAILURE TO REQUIRE THE STATE TO PROVE [DEFENDANT] KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE VICTIMS DEPICTED IN THE VIDEOS WERE UNDER THE AGE OF [EIGHTEEN] VIOLATES FREE SPEECH AND DUE PROCESS PROTECTIONS AND REQUIRES THE REVERSAL OF HIS TWO CONVICTIONS. (Not Raised Below).

POINT II

IT WAS REVERSIBLE ERROR TO PERMIT EXTENSIVE LAY OPINION TESTIMONY ABOUT A VARIETY OF ARCANE TECHNOLOGICAL ISSUES FAR BEYOND THE KEN OF AN ORDINARY JUROR. (Not Raised Below).

POINT III

THE TRIAL COURT IMPROPERLY USED [DEFENDANT'S] CLAIMS OF INNOCENCE AS AN AGGRAVATING FACTOR AT SENTENCING. (Not Raised Below).

Based on our review of the record and the applicable legal principles, we reject defendant's contentions and affirm.

I.

We glean these facts from the jury trial conducted on diverse dates in July 2022, during which Monmouth County Prosecutor's Office (MCPO) Detectives Tiffany Lenart, John Sosdian, and Brian Migliorisi, as well as Federal Bureau

3

of Investigation (FBI) Program Coordinator Nicholas Perone, Jr., of the Computer Analysis Response Team (CART), testified for the State. Defendant and his wife testified for the defense.

Lenart, Sosdian, and Migliorisi were all assigned to the computer crimes unit. Lenart testified that this unit was responsible for conducting "reactive and proactive internet crimes against children investigations," as well as performing "digital forensic examinations" of electronic devices. On March 15, 2017, she discovered that a CSEAM video had been downloaded to the eMule peer-to-peer file sharing program from an IP address she later learned was assigned to defendant's address in Freehold. Lenart also determined that the "nickname associated with the account that was sharing out this download" was "Onlytheshadow81," which defendant later admitted was his username. The video was moved into evidence, without objection, and part of it was played for the jury.

Lenart explained that a peer-to-peer file sharing program is a downloadable software that allows a user "to download files such as books, images, movies, [and] computer software from other users that are . . . also connected to the internet and using that file sharing program or a compatible file

A-3539-22

sharing program and then are offering these files for other people to download."

According to Lenart,

> there are several peer[-]to[-]peer programs that are law enforcement[-]specific versions that force a one[-]to[-]one stream download, which means the law enforcement officer operating the software downloads specific files that are flagged by hash values, which is a mathematical algorithm that applies a specific numerical and alphabetic value to a video or an image.
>
> Those are compiled in a list by the National Center for Missing and Exploited Children. The peer[-]to[-]peer software then runs this list on the internet looking for any users who might be sharing those files. Then our law enforcement software specifically downloads those files from those users.

Lenart testified that as a result of the March 15 discovery, in the early morning hours of July 26, 2017, about a dozen members of the MCPO's computer crimes unit and internet crimes against children taskforce responded to defendant's residence to conduct a search of the house. Defendant's wife answered the door and allowed the officers to enter the residence. Once inside, they learned that defendant was asleep. When he awoke, the officers told defendant and his wife that "the reason for [the] search that morning . . . [was] to look for electronics and potentially any evidence of child pornography."

During the search, law enforcement officers recovered over 100 pieces of electronic equipment from the residence, including a USB drive that was

5

connected through an adapter to the television in defendant's bedroom. Through forensic analysis, officers ultimately found over 100 CSEAM videos on the USB drive. Portions of those videos were played for the jury without audio. The file names included the following:

- "PTHC[1] pedo, 5 y-o vaginal penetration"

- "Rita, Mexican girl and father two"

- "Laura[2] special, 10[-]13 y-o memorial"

- Lolly . . . 17 year old teaches 13 year old sex with B-F, amazing"

- "PTHC, 9 y-o"

- "PTHC[-]Lolita . . . super big cock fucking little girl"

- "K girl 8 y-o[-]sucking and trying fuck"

- "Valia . . . 7 y-o, sweet Russian angel with smile and a ribbon in her hair at play fuck time with her daddy, . . . good one, new age free family PTSC, PTHC"

- "Pedo[.]PTHC[-]Jenny 9 y-o daughter[-]zoo, 5 y-o girl, dog, and man 2007"

- "12 y-o, Laura mouth pump and swallows"

---

[1] PTHC is an abbreviation for "preteen hardcore."

[2] "Laura" is an identified victim of child sexual abuse who committed suicide.

A-3539-22

- "12 y-o, Laura[_]BJ[_]cum on face two"

- "12 y-o, Laura[-]anal no condom cum on pussy"

- "PTHC, 5 y-o, Kelly[-]new stuff"

- "PTHC webcam[-]3 y-o, family of four . . . mom blows 7 y-o boy, 3 y-o girl"

- "PTHC, Nina[_]two . . . 7 y-o BJ"

- "Boy and girl 10 y fuck in car first time"

- "4 y-o, PTHC Ray Gold[3] real[!!]"

- "X-X-X,[-]PTHC[-]12 y-r, real kids fucking[-]no blood . . . [,] interracial"

- "PTHC pedo rare deep throat 5 y-o, wow no gagging"

- "PTHC hussy fan Ray Gold 6 y-o and 8 y-o"

- "[!] PTHC . . . father and his 10 y-o twin[] daughters[-]13 m, 19 f"

"Onlytheshadow81" was the username associated with these downloaded videos.

Additional files from the USB drive found in defendant's bedroom had been deleted. Officers were able to recover the names of those deleted files but

---

[3] Ray Gold is reportedly a known "producer of child pornography."

not the files themselves.  Ninety-seven of those file names had "child pornography indicative terms in the names."  In the home's spare room, officers recovered a tower operating system hard drive that was connected to "the [eMule] peer[-]to[-]peer file sharing program," and set to store downloads in a folder labeled "Emule incoming."  The folder contained duplicates of certain videos found on the USB drive.  The folder was created and accessed on December 3, 2014, and modified on July 14, 2017.  Lenart conducted a forensic analysis of the hard drive and discovered "torrent files" with "names that were indicative of child pornography."

Lenart explained that

> [a] torrent file is like a file about files.  So when you're using a peer[-]to[-]peer file sharing program that is torrent based, you get a file that gives you the information about what is contained in the torrent and the torrent is usually a package.
>
> . . . [I]n this instance, the torrent files will come in either an xml, which is like a spreadsheet[,] or a text file.  And it gives you the approximate file size, the number of fields that are contained within the package and the name.

During the search, defendant directed the officers to a "[storage] trailer that was parked outside."  Defendant told the officers that the trailer contained his son's electronic devices.  Defendant also said that "his son had told him about

peer[-]to[-]peer file sharing." Upon reviewing the electronics seized from the trailer, officers found "some images of age[-]difficult child pornography," which Lenart defined as likely depicting children between the ages of twelve and fourteen. Lenart explained that it was "[h]ard to pinpoint the exact age." She added "there were user profiles for Keith[, defendant's son,] on some of those items." Although most of the age-difficult CSEAM had been deleted, officers used forensic software to recover the deleted files.

On October 19, 2018, defendant was charged in a two-count Monmouth County indictment with third-degree endangering the welfare of a child by knowingly possessing or viewing child pornography, N.J.S.A. 2C:24-4(b)(5)(b)[4]; and second-degree endangering the welfare of a child by knowingly storing or maintaining less than twenty-five items depicting child pornography using a file-sharing program, N.J.S.A. 2C:24-4(b)(5)(a)(iii).

At trial, defendant denied having any knowledge of what was in the files and denied viewing any child pornography on his computer. Defendant recounted that he had been working with computers since 1979 and considered himself a computer "expert." According to defendant, "this whole case start[ed]

---

[4] The indictment did not specify a subsection of the statute and did not identify a specific amount of CSEAM defendant allegedly possessed.

A-3539-22

out when [he] receive[d] a message from [his] daughter in North Carolina" about five years earlier that his son had passed away.[5]  Defendant later learned his son died by suicide, and he "want[ed] to find out why."  Defendant explained:

> I decided that anything that had any information that he had, any computers or storage devices or whatever that he had, I was gonna take back with me to New Jersey so that I could find out what was going on . . . in his head.  And as far as the monitors and things or anything that didn't have any storage on it, I would just give it away while I was down there, distribute it to whoever needed it . . . .

Defendant "had intended to hook [Keith's] server up in [his] office" but "never got around to that."  He loaded Keith's files onto his own NAS[6] drive but had no opportunity to look at them.  He testified that serving as the primary caretaker for his sick wife and maintaining their home took up much of his time.  Defendant's wife's testimony largely echoed defendant's testimony.  She explained that defendant took care of her due to her various medical issues.  She avowed that her husband never "b[rought] any pornography into the house or anything like that," not even "a naked magazine . . . , [or] Playboy even."

_____

[5]  Defendant's son passed away on July 2, 2016.

[6]  According to Perone, NAS stands for "network attached storage," which is "essentially a computer . . . specifically designed just for storage" and "doesn't have a keyboard" or "a monitor."  Thus, "[t]he only way to access it is through the network."

On July 20, 2022, after less than an hour of deliberations, the jury found defendant guilty on both counts. Defendant was sentenced on January 13, 2023, and a memorializing judgment of conviction was entered the same day. This appeal followed.

II.

In Point I, defendant argues that "our endangering statute's failure to have a scienter requirement as to the age of the victim in possession and distribution of child pornography prosecutions is violative of state and federal free-speech protections and is thus unconstitutional." Citing United States v. X-Citement Video, Inc., 513 U.S. 64, 71 n.2 (1994), he asserts that the statute "must be deemed facially unconstitutional as it prohibits any reasonable mistake-of-age defense" or, at the very least, "unconstitutional as applied to individuals who had no in-person interaction with the victim depicted in the video." He concedes that "child pornography is outside the scope of the First Amendment" but nonetheless submits that "statutes prohibiting child pornography must take care to comport with the First Amendment." He posits that "the remedy for failing to instruct the jury that the State was required to prove [defendant] should have known or reasonably known the victims depicted in the videos were under [eighteen] must be the reversal of his convictions."

Because defendant raises this issue for the first time on appeal, we review for plain error and determine if the alleged error is "clearly capable of producing an unjust result." State v. Montalvo, 229 N.J. 300, 320-21 (2017) (quoting R. 2:10-2). "The mere possibility of an unjust result is not enough." State v. Funderburg, 225 N.J. 66, 79 (2016). Instead, plain error "is a 'high bar,' requiring reversal only where the possibility of an injustice is 'real' and 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Trinidad, 241 N.J. 425, 445 (2020) (citation omitted) (first quoting State v. Santamaria, 236 N.J. 390, 404 (2019); and then quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Our Supreme Court has "cautioned that 'rerun[ning] a trial when the error could easily have been cured on request[ ] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.'" State v. Singh, 245 N.J. 1, 13 (2021) (alterations in original) (quoting Santamaria, 236 N.J. at 404-05). Thus, "[t]o determine whether an alleged error rises to the level of plain error, it 'must be evaluated "in light of the overall strength of the State's case."'" Id. at 13-14 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

12

"The First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, instructs that 'Congress shall make no law . . . abridging the freedom of speech.'" State v. Higginbotham, 257 N.J. 260, 274 (2024) (quoting U.S. Const. amend. I). Nonetheless, "'[a] presumption of validity attaches to every statute,' and 'defendant bears the burden of establishing its unconstitutionality.'" State v. Hill, 256 N.J. 266, 280 (2024) (quoting State v. Lenihan, 219 N.J. 251, 265-66 (2014)). "We apply 'every possible presumption' in favor of the validity of a challenged statute, recognizing that it 'represents the considered action of a body composed of popularly elected representatives.'" Higginbotham, 257 N.J. at 280 (quoting State v. Trump Hotels & Casino Resorts, Inc., 160 N.J. 505, 526 (1999)). "We will thus not strike a statute as unconstitutional 'unless its repugnancy to the Constitution is clear beyond a reasonable doubt.'" Ibid. (quoting State v. Smith, 251 N.J. 244, 263 (2022)).

"A party may challenge a statute as either facially vague or vague as applied." State v. Balbosa, 481 N.J. Super. 497, 526 (App. Div. 2025). "Where a statute 'is challenged as vague as applied[, it] must lack sufficient clarity respecting the conduct against which it is sought to be enforced.'" Ibid. (alteration in original) (quoting Lenihan, 219 N.J. at 267).

A court may hold a law facially invalid for overbreadth under the First Amendment only if "the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep.'" [United States v. Hansen, 599 U.S. 762, 770 (2023)] (quoting [United States v. Williams, 553 U.S. 285, 292 (2008))]. In this regard, "a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." Ibid. (emphasis added). "In the absence of a lopsided ratio" of unconstitutional applications to constitutional ones, "courts must handle unconstitutional applications as they usually do—case-by-case." Ibid.

[Hill, 256 N.J. at 283 (citations reformatted).]

As such, defendants fail to carry their burden of establishing unconstitutionality where they identify only "one unconstitutional application of the statute: [their] own case." Id. at 289. This is so because the overbreadth concept "rests on principles of substantive due process," and focuses on the question of "whether the reach of the law extends too far," rather than "whether the law's meaning is sufficiently clear." State v. Carter, 247 N.J. 488, 518 (2021) (quoting Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n.21 (1983)). Indeed, "[t]he evil of an overbroad law is that in proscribing constitutionally protected activity, it may reach farther than is permitted or necessary to fulfill the state's interests." Ibid. (quoting Town Tobacconist, 94 N.J. at 125 n.21).

14

"The First Amendment's protections, while substantial, are not without limitations . . . ." Balbosa, 481 N.J. Super. at 525. "Historically, certain 'types of speech [were] so utterly lacking in social value that they [fell] outside the protections of the First Amendment altogether.'" Higginbotham, 257 N.J. at 274 (alterations in original) (quoting Hill, 256 N.J. at 281). As defendant concedes, child pornography is one such category that is unprotected by the First Amendment. Ibid.; see New York v. Ferber, 458 U.S. 747, 764 (1982) (recognizing a separate exception to the First Amendment for child pornography).

As our Supreme Court explained,

> [c]hild pornography need not meet the Miller[7] obscenity standard to be proscribed; it is a separate type of speech that is categorically unprotected by the First Amendment. Ashcroft v. Free Speech Coal., 535 U.S. 234, 240 (2002). And unlike obscenity, states "may constitutionally proscribe the possession and viewing of child pornography" in the privacy of one's home. Osborne v. Ohio, 495 U.S. 103, 111 (1990).
>
> In Ferber, the Supreme Court discussed why states "are entitled to greater leeway" in proscribing child pornography than they are in regulating obscenity. 458 U.S. at 756. Several of the Court's reasons bear mention here.

---

[7] Miller v. California, 413 U.S. 15 (1973).

15

First, states have a compelling interest in "safeguarding the physical and psychological well-being" of children, and specifically in preventing their "sexual exploitation and abuse." Id. at 756-57 (quotation omitted). Child pornography is "harmful to the physiological, emotional, and mental health" of the children used in its production, and its creation constitutes child sexual abuse. Id. at 758; see also Free Speech Coal., 535 U.S. at 249, 254 (under Ferber, child pornography images are "themselves the product of child sexual abuse" and "the creation of the speech is itself the crime of child abuse"); Paroline v. United States, 572 U.S. 434, 439-40 (2014) (production of child pornography "involves child abuse").

Second, beyond its production, the distribution of child pornography is "intrinsically related to the sexual abuse of children" because it constitutes a "permanent record" of that abuse. Ferber, 458 U.S. at 759. Later cases have explained that the circulation of child pornography can "cause[ ] the child victims continuing harm by haunting the children in years to come," Osborne, 495 U.S. at 111, and causes a "new injury to the child's reputation and emotional well-being" with each re-publication, Free Speech Coal., 535 U.S. at 249.

And third, because it is "irrelevant to the child [who has been abused]" by the pornography's creation whether the final product has "literary, artistic, political or social value," the Miller standard does not vindicate the State's interest in preventing child sexual abuse and therefore need not be satisfied. Ferber, 458 U.S. at 761 (alteration in original) (quotation omitted).

In keeping with the State's compelling interest "in protecting the children exploited by the [child pornography] production process," the Supreme Court

16

subsequently clarified that child pornography can be banned, consistent with the First Amendment, if it is "produced" using "real children." Free Speech Coal., 535 U.S. at 240, 245-46. Laws that ban images that "do not involve, let alone harm, any children in the production process," do not satisfy the government's compelling interest in protecting children from sexual abuse recognized in Ferber, and therefore violate the First Amendment unless they conform to the Miller obscenity standard. Id. at 240-41.

[Higginbotham, 257 N.J. at 275-77 (citations omitted and reformatted).]

"[T]he Constitution places a lesser burden on the states to justify strict liability for serious criminal offenses than for regulatory offenses." State v. Maldonado, 137 N.J. 536, 550 (1994). The rationale is that "the added deterrence of strict liability is all the justification that is needed in view of the serious threat to public safety posed by the conduct prohibited by those laws." Id. at 551.

As such, under both federal and state case law, "the State has the power to define a crime without proof of mens rea so long as the definition does not offend fundamental notions of justice." Id. at 555 (italicization omitted); see, e.g., United States v. Balint, 258 U.S. 250, 253-54 (1922) (upholding constitutionality of statute prohibiting sale of illegal drugs that lacked mens rea element); United States v. Holland, 810 F.2d 1215, 1223-24 (D.C. Cir. 1987)

17

(upholding constitutionality of statutes prohibiting sale of drugs near school zone regardless of defendant's knowledge of school's location); State v. Ivory, 124 N.J. 582, 592-95 (1991) (upholding statute enhancing punishment for drug distribution within one thousand feet of school property regardless of defendant's knowledge because it "presents a rational and reasonable approach by the Legislature to reduce drugs around schools"); State v. Hatch, 64 N.J. 179, 182, 188-89 (1973) (holding that a Massachusetts resident driving through New Jersey could be convicted of violating New Jersey's gun control laws notwithstanding that the driver had complied with gun control requirements in his home state and was unaware that he was subject to additional legal requirements while passing through New Jersey).

Thus, "a state can justify imposition of strict liability for a serious criminal offense merely by suggesting a rational basis to support the legislative determination that the added deterrence of strict liability punishment represents a reasonable approach." Maldonado, 137 N.J. at 553. Statutes proscribing possession and distribution of child pornography undoubtedly meet that criteria.

"[S]tatutory construction begins with an examination of the plain language of the statute, 'ascrib[ing] to the . . . words their ordinary meaning and significance.'" Higginbotham, 257 N.J. at 280 (omission and second alteration

18

in original) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "We 'may neither rewrite a plainly-written enactment of the Legislature nor presume that the Legislature intended something other than that expressed by way of the plain language.'" Ibid. (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)).

Applying these principles, we reject defendant's constitutional challenge to subsection (b) of the child endangerment statute criminalizing possession and distribution of child pornography, see N.J.S.A. 2C:24-4(b). We are convinced that the statute is neither unconstitutional on its face nor as applied in violation of the First Amendment.

We first look at the statutory language. Defendant was convicted under N.J.S.A. 2C:24-4(b)(5)(a)(iii), which provides:

> A person commits a crime if, by any means, including, but not limited to, the [i]nternet, the person:
>
> . . . .
>
> (iii) knowingly stores or maintains an item depicting the sexual exploitation or abuse of a child using a file-sharing program which is designated as available for searching by or copying to one or more other computers.

The definition of an "[i]tem depicting the sexual exploitation or abuse of a child" is an image that "depicts a child engaging in a prohibited sexual act or in the

simulation of such an act."   N.J.S.A. 2C:24-4(b)(1).   The statute defines "[p]rohibited sexual act" as "[a]ny act of sexual penetration or sexual contact," among other things, N.J.S.A. 2C:24-4(b)(1) (citing N.J.S.A. 2C:14-1).

N.J.S.A. 2C:24-4(b)(5)(a) also expressly states that for a violation of subparagraph (iii),

> the State shall not be required to offer proof that an item depicting the sexual exploitation or abuse of a child had actually been searched, copied, transmitted, or viewed by another user of the file-sharing program, or by any other person, and it shall be no defense that the defendant did not intend to distribute the item to another user of the file-sharing program or to any other person.  Nor shall the State be required to prove that the defendant was aware that the item depicting the sexual exploitation or abuse of a child was available for searching or copying to one or more other computers, and the defendant shall be strictly liable for failing to designate the item as not available for searching or copying by one or more other computers.

Defendant was also convicted of violating N.J.S.A. 2C:24-4(b)(5)(b)(iii), which makes it a third-degree crime when a person "knowingly possesses, knowingly views, or knowingly has under the person's control, through any means, including the [i]nternet, . . . items depicting the sexual exploitation or abuse of a child."  Under the statute, "the term 'possess' includes receiving,

20

viewing, or having under one's control, through any means, including the [i]nternet." N.J.S.A. 2C:24-4(b)(5)(a).[8]

Critically, subsection (b), with which defendant was charged and convicted, "criminalize[s] the possession and distribution of child pornography, an unprotected category of speech under the First Amendment." Balbosa, 481 N.J. Super. at 532. Any claim that the images were not child pornography is debunked by the content of the videos and the titles of the files. Additionally, subsection (b) is not "overbroad" as it does "not 'criminalize[ ] a substantial amount of material that is neither obscene nor child pornography.'" Ibid. (alteration in original) (quoting Higginbotham, 257 N.J. at 281). Neither does it "lack sufficient clarity respecting the conduct against which it is sought to be enforced." Lenihan, 219 N.J. at 267 (quoting Visiting Homemaker Serv. v. Bd. of Chosen Freeholders, 380 N.J. Super. 596, 612 (App. Div. 2005)).

We are unpersuaded by defendant's reliance on the United States Supreme Court's holding in X-Citement Video to support his constitutional challenge. There, the defendants were charged with violating 18 U.S.C. §§ 2252(a)(1) and (2). 513 U.S. at 66. The question was whether "knowingly" as used in the

_____

[8] The indictment did not charge defendant with possessing a certain amount of CSEAM, nor was the jury instructed to find as such. During the charge conference, the parties agreed to the omission.

statute modified "only the surrounding verbs: transports, ships, receives, distributes, or reproduces," or if it "modif[ed] the elements of the minority of the performers [in the pornographic videos], or the sexually explicit nature of the material." Id. at 68. The Court held that, logically and grammatically, it made the most sense that the mens rea "knowingly" applied to all aspects of the statute, including the age of the person depicted in a sexually explicit video, and therefore read the word "knowingly" to modify each part of the statute. Id. at 68-70, 78.

The Court explained that to not read the statute in that way would possibly lead to "absurd" results:

> If the term "knowingly" applies only to the relevant verbs in § 2252—transporting, shipping, receiving, distributing, and reproducing—we would have to conclude that Congress wished to distinguish between someone who knowingly transported a particular package of film whose contents were unknown to him[ or her], and someone who unknowingly transported that package. It would seem odd, to say the least, that Congress distinguished between someone who inadvertently dropped an item into the mail without realizing it, and someone who consciously placed the same item in the mail, but was nonetheless unconcerned about whether the person had any knowledge of the prohibited contents of the package.
>
> Some applications of respondents' position would produce results that were not merely odd, but positively

22

A-3539-22

absurd.  If we were to conclude that "knowingly" only modifies the relevant verbs in § 2252, we would sweep within the ambit of the statute actors who had no idea that they were even dealing with sexually explicit material.  For instance, a retail druggist who returns an uninspected roll of developed film to a customer "knowingly distributes" a visual depiction and would be criminally liable if it were later discovered that the visual depiction contained images of children engaged in sexually explicit conduct.  Or, a new resident of an apartment might receive mail for the prior resident and store the mail unopened.  If the prior tenant had requested delivery of materials covered by § 2252, his [or her] residential successor could be prosecuted for "knowing receipt" of such materials.  Similarly, a Federal Express courier who delivers a box in which the shipper has declared the contents to be "film" "knowingly transports" such film.  We do not assume that Congress, in passing laws, intended such results.

[Id. at 69.]

Nonetheless, the Court did not appear to entirely foreclose the possibility of child pornography statutes without a scienter requirement as to the age of the victim on the part of the defendant.  Critically, in its application of the relevant principles, the Court first found the statute "akin to the common-law offenses against the state, the person, property, or public morals[] that presume a scienter requirement in the absence of express contrary intent."  Id. at 71-72 (emphasis added) (citation omitted) (internal quotation marks omitted).

Finally, the Court expounded:

A final canon of statutory construction supports the reading that the term "knowingly" applies [to each part of the statute]. Cases such as <u>Ferber</u>, 458 U.S. at 765 ("As with obscenity laws, criminal responsibility may not be imposed without some element of scienter on the part of the defendant"); <u>Smith v. California</u>, 361 U.S. 147, 154-55 (1959); <u>Hamling v. United States</u>, 418 U.S. 87, 123-24 (1974); and <u>Osborne</u>, 495 U.S. at 115, suggest that a statute completely bereft of a scienter requirement as to the age of the performers would raise serious constitutional doubts. It is therefore incumbent upon us to read the statute to eliminate those doubts <u>so long as such a reading is not plainly contrary to the intent of Congress</u>.

[<u>X-Citement Video</u>, 513 U.S. at 78 (emphasis added) (citations reformatted).]

Significantly, our State's statute makes clear that the Legislature intended to dispose of the age requirement:

For purposes of this subsection, a person who is depicted as or presents the appearance of being under the age of [eighteen] in any photograph, film, videotape, computer program or file, video game, or any other reproduction or reconstruction shall be rebuttably presumed to be under the age of [eighteen]. If the child who is depicted as engaging in, or who is caused to engage in, a prohibited sexual act or simulation of a prohibited sexual act or portrayed in a sexually suggestive manner is under the age of [eighteen], the actor shall be strictly liable and it shall not be a defense that the actor did not know that the child was under the age of [eighteen], nor shall it be a defense that the actor believed that the child was [eighteen] years of age or older, even if such a mistaken belief was reasonable.

24

[N.J.S.A. 2C:24-4(b)(6).][9]

We are therefore satisfied that the statute is neither unconstitutional on its face nor leaves any ambiguity as to the Legislature's express intent as contemplated by X-Citement Video.

Defendant's argument that his case is distinguishable from State v. Perez, 177 N.J. 540 (2003), because his case did not involve in-person contact with a child is equally unavailing.  In Perez, our Supreme Court explained that when looking at the Code of Criminal Justice (Code) as a whole, the Legislature intended the age standards for sex offenses against children to similarly apply to the child endangerment statute:

> The child-endangerment statute is codified under chapter 24 of the Code, whereas other sexual offenses are found under chapter 14.  Given the statute's text and

---

[9] Defendant also contends that out-of-state cases applying X-Citement Video support his argument that N.J.S.A. 2C:24-4(b)(5)(b)(iii) and 2C:24-4(b)(5)(a)(iii) are unconstitutional.  We note at the outset that out-of-state judicial decisions are not binding on this court.  State v. Warriner, 322 N.J. Super. 401, 407 (App. Div. 1999).  Nonetheless, we are unpersuaded.  The cases cited by defendant involved statutes that, for instance, specifically allowed for a mistake-of-age defense, see, e.g., State v. Zarnke, 589 N.W.2d 370, 372 (Wis. 1999); were ambiguous regarding their mens rea requirement, see, e.g., State v. Mauer, 741 N.W.2d 107, 109 (Minn. 2007); implemented different mens rea requirements in different subsections of the statute, see, e.g., State v. Rael, 548 P.3d 66, 69 (N.M. 2024); or required the State to prove that the defendant knew the victims in the images were minors, see, e.g., Gerbert v. State, 793 S.E.2d 131, 135 (Ga. Ct. App. 2016).

the Code's overall structure, we conclude that the Legislature intended the chapter 14 standard in respect of a victim's age to apply here. The import of that conclusion is that the child-endangerment statute requires only objective proof that the alleged victim was a child under the age of sixteen, not that the accused knew or reasonably should have known that fact. See N.J.S.A. 2C:14-5(c) (providing that defendant cannot assert as defense mistaken belief that his or her victim was "above the age stated for the offense"). Under that standard, the State sufficiently proved the age of the victim, irrespective of defendant's statement that [the victim]'s "looks [were] deceiving" and that he believed that she was "about [sixteen]."

[Perez, 177 N.J. at 555 (second alteration in original) (citation reformatted).]

Neither can defendant demonstrate that the statute is unconstitutional as applied to him because even if defendant could have invoked a mistake-of-age defense, the outcome at trial would have been the same given the strength of the State's case. The State showed the jury over 100 CSEAM videos along with graphic titles. Defendant concedes that a mistake-of-age defense would not apply to all the materials viewed by the jury during the trial, and the parties agreed that the jury was not required to identify a specific number of CSEAM images in reaching its verdict. Therefore, the quantity of CSEAM videos defendant knew depicted children was of no moment so long as there was at

26

least one file that objectively proved the victim's age and would not have been subject to a mistake-of-age defense. Such proof was amply adduced at trial.

### III.

In Point II, defendant argues that the State's witnesses' testimonies involving "peer-to-peer file-sharing systems; hash values assigned to files; torrents; write blockers; various forensic software . . . ; Hyper-V networking drives; and other obscure technological issues discussed in deep technical detail" by Lenart, Migliorisi, and Perone "required a duly qualified expert along with an appropriate instruction to the jury about how to evaluate expert evidence." Once again, because defendant failed to raise the issue in the trial court, we review for plain error. See R. 2:10-2.

"Witnesses, including police officers, testify in a variety of roles." State v. Miller, 449 N.J. Super. 460, 470 (App. Div. 2017), rev'd on other grounds, 237 N.J. 15 (2019). "A fact witness is one who testifies as to what 'he or she perceived through one or more of the senses.'" Ibid. (quoting State v. McLean, 205 N.J. 438, 460 (2011)). "Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." McLean, 205 N.J. at 460.

Expert witnesses, however, "explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury." Ibid. "Expert testimony is admissible '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.'" State v. Simms, 224 N.J. 393, 403 (2016) (quoting N.J.R.E. 702); see also State v. Cain, 224 N.J. 410, 420 (2016). "In other words, to be admissible, expert testimony should 'relate[ ] to a relevant subject that is beyond the understanding of the average person of ordinary experience, education, and knowledge.'" State v. Sowell, 213 N.J. 89, 99 (2013) (alteration in original) (quoting State v. Odom, 116 N.J. 65, 71 (1989), abrogated on other grounds by, Cain, 224 N.J. 410). If the matter is within the competence of the jury, expert testimony is not needed. Ibid.

Lay opinion testimony is governed by N.J.R.E. 701, which permits a witness not testifying as an expert to provide "testimony in the form of opinions or inferences . . . if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." McLean, 205 N.J. at 456 (quoting N.J.R.E. 701 (1993)). "Courts in New Jersey have permitted police officers to testify as lay witnesses, based on their personal observations and their long experience in areas where expert testimony might otherwise be deemed necessary." State v. LaBrutto, 114 N.J. 187, 198 (1989).

[Miller, 449 N.J. Super. at 470-71 (alterations and omission in original) (emphasis omitted) (citations reformatted).]

Under N.J.R.E. 702, a witness may be qualified as an expert "by knowledge, skill, experience, training, or education." To demonstrate sufficient expertise, an expert witness "must possess the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion." State v. Frost, 242 N.J. Super. 601, 615 (App. Div. 1990). Expertise may be demonstrated "by occupational experience or by scientific study." Ibid. In other words, an expert "may be qualified 'by study without practice or by practice without study.'" Ibid. (quoting State v. Chatman, 156 N.J. Super. 35, 41 (App. Div. 1978)). Typically, courts take a "generous approach" when qualifying experts "based on training and experience." State v. Jenewicz, 193 N.J. 440, 454 (2008).

In Miller, like here, the defendant was charged with and convicted of child endangerment by possessing and distributing CSEAM. 449 N.J. Super. at 465. During the trial, the defendant objected to the testimony of the detective who performed the forensic analysis on his laptop because the detective "testified how peer-to-peer file sharing worked" and "the State had not offered or qualified him as an expert witness." Id. at 468. In overruling the objection,

> [t]he judge cited State v. Doriguzzi, 334 N.J. Super. 530, 538 (App. Div. 2000), for the proposition that "computers and their functioning are no longer topics that are so esoteric as beyond the ken of the average

 A-3539-22

person." The judge further found that [the detective] testified as a fact witness concerning the process by which he examined defendant's . . . laptop . . . and admitted the challenged testimony.

[Miller, 449 N.J. Super. at 468 (citation reformatted).]

The defendant appealed, arguing that the trial court erred in admitting the testimony without the State qualifying the detective as an expert. Id. at 470. In rejecting the defendant's argument, we were satisfied that the detective

did not testify as an expert or provide an expert opinion. Rather, he testified as a fact witness about his forensic investigation of defendant's laptop, and merely reported what he found, including the presence of videos and images depicting child pornography, and peer-to-peer software that allowed others to access the child pornography.

[Id. at 470-71.]

We added, however, that even if the testimony "fell within the scope of the expert opinion rule because it was specialized knowledge based on his training and experience," the admission of the testimony was "harmless" error. Id. at 471 (citing R. 2:10-2). In support, we explained that the detective's testimony made it clear "that he possessed sufficient education, training, and experience to qualify as an expert in the field of computer forensics." Ibid. Additionally, the defendant was provided with the detective's "name, address, curriculum vitae setting forth his qualifications, and his forensic report,"

30

avoiding any "surprise[]" or "prejudice[]" that may have accompanied the detective's testimony. Id. at 471-72.

Here, without objection, none of the witnesses were qualified as experts or offered expert testimony. Instead, they testified as fact witnesses. Lenart's testimony was based on her personal knowledge and experience using peer-to-peer software in her role as a detective in the computer crimes unit. She detailed her investigation in the case, including the forensic analysis she conducted of electronic equipment seized from defendant's residence during the search. Similarly, Migliorisi and Perone performed forensic analyses on defendant's electronics and recounted their respective tasks. Their testimony was limited to the analyses they performed within the scope of their jobs.

Our Supreme Court explained the difference between fact and expert testimony in McLean, 205 N.J. at 460:

> On one side of that line is fact testimony, through which an officer is permitted to set forth what he or she perceived through one or more of the senses. Fact testimony has always consisted of a description of what the officer did and saw . . . . Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer "believed," "thought" or "suspected," but instead is an ordinary fact-based recitation by a witness with first-hand knowledge. . . .

31

On the other side of the line, we have permitted experts, with appropriate qualifications, to explain the implications of observed behaviors that would otherwise fall outside the understanding of ordinary people on the jury.

[(Citations omitted).]

Even if the officers' testimonies went beyond that of fact witnesses, we find any error in their admission does not rise to the level of plain error. Indeed, "[w]here a witness possesses sufficient qualifications to have testified as an expert, any error in allowing the lay opinion may be deemed harmless." Miller, 449 N.J. Super. at 471 (citing State v. Kittrell, 279 N.J. Super. 225, 236 (App. Div. 1995)).

Here, each officer provided ample evidence of their education, experience, and training to qualify as an expert. Lenart testified that before working at the MCPO, she had been a detective at the New Jersey Division of Criminal Justice in the computer analysis and technology unit. Subsequently, as a member of the MCPO's computer crimes unit, she was "taskforced out to the [FBI] at the New Jersey Regional Computer Forensic Library." Lenart had attended over thirty trainings "specific to internet crimes against children, as well as digital forensics," and peer-to-peer software-specific classes designed "to operate the law enforcement versions" of the software. She also attended "[twenty-]plus

32

trainings in digital forensics"; was recognized by the International Association of Computer Forensic Examiners as a Certified Computer Forensic Examiner; and "[held] certified computer examiner and investigator['s] certification[s] as well as industry software[-]specific certifications."

Migliorisi had five years of experience in the MCPO's computer crimes unit. He had previously been a police officer with a different department for twelve years. Prior to his career in law enforcement, Migliorisi obtained "some training in computers and networking" at DeVry University. He also completed "numerous forensics trainings" that he used "in [his] everyday job in computer crimes." These trainings included "Magnet Axiom forensic training," "Cellebrite forensic training," a course at "the International Association of Computer Investigative Scientists," and "training courses" with the "National White Collar Crimes Center." He had received a "mobile device forensics certification" and a certification in a program "which specialize[d] in Macintosh[] and Apple products."

Perrone testified that as the CART program coordinator, his main responsibilities entailed "licensing the software packages[ and] the hardware" the program purchased; "obtaining" and "testing licenses"; and other duties. He had been "working with computers since 1991," was accepted into the CART

33

program in 2007, and "obtained their certification to be a forensic examiner" in 2008. He received a senior forensic examiner certification in 2013 and underwent general and "vendor[-]specific" trainings through the FBI. As to certifications, he testified that he "ha[d] probably too many to mention," but they included engineer, cybersecurity, and forensic examiner and analyst certifications. He estimated that he had "probably been the lead in over 200 [forensic] exams and . . . probably worked on just as many in some type of an assistance role." In short, because the State's witnesses "possessed sufficient education, training, and experience to qualify as . . . expert[s] in the field of computer forensics," any error was harmless. Ibid.

IV.

In Point III, defendant argues that he must be resentenced because the judge "erroneously used his claims of innocence as an aggravating factor to enhance his sentence." We disagree.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts.'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines
> were violated; (2) the aggravating and mitigating

34

factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under New Jersey's penal code, "a sentencing court first must determine, pursuant to N.J.S.A. 2C:44-1(a) and (b), whether aggravating and mitigating factors apply. After balancing the factors, the trial court may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). We do not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 205 N.J. 109, 127 (2011) (quoting Bieniek, 200 N.J. at 608).

Ultimately,

> [w]hether a sentence should gravitate toward the upper or lower end of the range depends on a balancing of the relevant factors. Fuentes, 217 N.J. at 73. "[W]hen the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." State v. Natale, 184 N.J. 458, 488 (2005).
>
> [Case, 220 N.J. at 64-65 (second alteration in original) (citations reformatted).]

Here, the judge sentenced defendant to four years in prison on the third-degree child endangerment count, and a concurrent eight-year term on the second-degree child endangerment count. The judge found aggravating factors one, two, three, and nine based on the heinous nature of the offenses, the gravity and seriousness of the harm inflicted on the victims, the high risk of re-offense, and the strong need for deterrence. See N.J.S.A. 2C:44-1(a)(1), (2), (3), (9). The judge found mitigating factors seven and eleven based on defendant's lack of a prior criminal history and the hardship imprisonment posed to him and his wife. See N.J.S.A. 2C:44-1(b)(7), (11). After weighing the factors, the judge determined the aggravating factors substantially outweighed the mitigating factors.

Defendant asserts that the judge erred in applying aggravating factor three based on his claims of innocence. In finding aggravating factor three, the judge relied on "[d]efendant's repeated refusal to accept responsibility," explaining that:

> This is coupled and consistent with the findings of Dr. Wolpert who indicated during his evaluation[10] [that] [d]efendant portrayed himself as quote, "relatively free of common shortcomings most individuals would be

---

[10]   See N.J.S.A. 2C:47-1 (requiring the completion of a psychological examination of the offender for designated offenses, including child endangerment as charged here).

willing to acknowledge and [d]efendant was reluctant to recognize even minor faults in himself[,"] end quote.

Not surprisingly [d]efendant saw, quote, "no need for changes in his behavior[,"] end quote. An individual with . . . such limited insight and desire or willingness to change is at risk of re-offense.

I balance this with his advanced age and medical concerns, but note that these offenses were committed from the comfort of his home when he was approximately [sixty-nine] years of age. While the passing of time and worsening of his medical conditions may temper his ability to seek out the materials that were [the] subject of this conviction, they do not prevent him from engaging in this type of crime as long as he has access to the internet. I give this factor moderate weight.

Aggravating factor three contemplates "[t]he risk that the defendant will commit another offense." N.J.S.A. 2C:44-1(a)(3). Although "sentencing courts frequently look to the defendant's criminal history" when applying aggravating factor three, "the absence of a criminal record will not preclude application of aggravating factor three so long as it is supported by other credible evidence in the record." State v. Rivera, 249 N.J. 285, 300 (2021). "For example, a sentencing judge may reasonably find aggravating factor three when presented with evidence of a defendant's lack of remorse or pride in the crime." Ibid. (citing State v. O'Donnell, 117 N.J. 210, 216 (1989)).

Here, we discern no abuse of discretion in the judge's application of aggravating factor three, nor did she—as defendant contends—use defendant's professed innocence against him. Rather, the judge's finding is based on competent and credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3539-22